798 P.2d 1349

**STATE of Arizona, Appellee,**

v.

**James Thomas TUCKER, Appellant.**

**No. 1 CA–CR 12234.**

Court of Appeals of Arizona,
Division 1, Department B.

March 27, 1990.

As Corrected March 28, 1990.

Reconsideration Denied May 25, 1990.

Review Denied Nov. 6, 1990.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Criminal Div., Barbara A. Jarrett, Asst. Atty. Gen., Phoenix, for appellee.

Heron, Burchette, Ruckert & Rothwell by James R. Hart, II, Mesa, for appellant.

## OPINION

KLEINSCHMIDT, Judge.

The defendant, James T. Tucker, was convicted upon trial by jury of four counts of public sexual indecency and sentenced to concurrent terms of imprisonment on each count, the longest of which was five years. His alleged conduct involved a child. We reverse and remand for a new trial because the trial court erred in admitting hearsay evidence of what the child told the police

and a social worker. The court also erred in allowing an expert witness for the state to express opinions which invaded the province of the jury.

The facts are as follows. The child who is the alleged victim of these crimes had been living in Mississippi with her family. The family was in turmoil because the parents were going through a divorce. The defendant, who is the child's uncle, was offered a job in Phoenix, and the child's mother felt it best for the child and the child's older brother to move to Phoenix with the defendant. The three came to Phoenix prior to Christmas of 1986. At first they lived with relatives and then with friends, until, in early 1987, they rented their own apartment. The child was twelve years old at that time.

The child testified that around Valentine's Day in 1987, the defendant began to walk around the apartment naked. She testified about four separate incidents in which he masturbated himself to orgasm in her presence. She said these occurred on February 16; February 17; February 19; and March 6, 1987. The child testified that on one of these occasions she was covered by a quilt while pretending to be asleep, and the defendant masturbated and ejaculated on the quilt. The child further testified that her uncle was both verbally and physically abusive to her.

The child testified that at some time after she, her brother, and the defendant moved to their own apartment, and after the defendant's improper behavior began, she talked to her mother on the telephone. She told her mother that she wanted to return to Mississippi. The mother told her that she would get the money together to pay for the child's return as soon as she could. The child had previously been molested by her step-grandfather and some family members had blamed her for his ensuing suicide. The child testified that as a result of this earlier experience, she feared her mother would blame her for the defendant's behavior and thus said nothing during the telephone conversation about the defendant's sexual misconduct.

The child had made a friend at school named Becky. She told Becky about the first three incidents, and Becky advised her to write a letter to her mother. The child followed this advice and in the letter, written sometime in late February or early March, she told her mother that the defendant was not treating her well. In that letter she added, "I make scars on my hands with my fingernails its because he's always on my case and he said ... that if I told anyone that he wants to mom I just want to come home. I'm afraid I'm going to kill myself don't tell him I said that." She did not, however, say anything explicit about the defendant's sexual conduct. The mother did not telephone the child regarding the letter.

After the fourth alleged incident, the child's friend Becky, on March 9, 1987, advised the child to call the police. When the child did not do so, Becky called them herself. When the police responded, the child related her story, first to a patrolman, then to a detective, and finally to a social worker. The defendant was arrested shortly thereafter. The child's mother, troubled by the letter she had received from the child, had driven from Mississippi and arrived in Phoenix soon after the defendant was arrested. She took the child and her brother back to Mississippi.

Before trial, the state filed a motion *in limine* seeking to admit the statements made by the child to the police and to the social worker, and to admit expert testimony concerning the behavior of child molesters and their victims. The defendant objected to this and he filed his own motion *in limine* to exclude such evidence. The court ultimately decided to allow the admission of the evidence but, initially at least, limited the expert's testimony to the general behavioral characteristics of child molesters and their victims.

In addition to the child and a number of other witnesses, the state did call the police officer, the detective, and the social worker. All three were allowed to testify as to what the child had told them about the defendant's conduct. All of the statements were generally consistent with the child's

testimony. The defendant testified on his own behalf and denied the accusations. He said that he had been having trouble getting along with the child and had once slapped her because she called him a name. It was the theme of the defense that the child's false accusations were motivated by her desire to return to Mississippi without delay.

## ADMISSION OF THE CHILD'S PRIOR CONSTENT STATEMENTS

 The defendant argues that it was error to allow the police officer, the detective, and the social worker to testify about what the child had told them. Generally, prior consistent statements made by a witness are hearsay and are therefore not admissible. *State v. Martin*, 135 Ariz. 552, 663 P.2d 236 (1983). Another authority has observed that the trustworthiness of a story is not enhanced by repetition. 4 Weinstein & Berger, *Weinstein's Evidence* § 801(d)(1)(B)[01] (1988). *Cf. State v. LeGrand*, 153 Ariz. 21, 28, 734 P.2d 563, 570 (1987).

There is an exception to this general rule which is found in Rule 801(d)(1)(B), Arizona Rules of Evidence, 17A A.R.S. (Supp.1989). It reads:

> (d) Statements which are not hearsay. A statement is not hearsay if:
>
> (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, or (B) *consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....* (Emphasis added.)

In *Martin*, the supreme court construed the rule and said:

> The only way to be certain that a prior consistent statement in fact controverts a charge of 'recent fabrication or improper influence or motive' is to require that the statement be made at a time when the possibility that the statement was made for the express purpose of corroborating or bolstering other testimony is minimized. In other words, to be admissible, the witness must make the prior consistent statement before the existence of facts that indicate a bias arises.

*Id.*, 135 Ariz. at 554, 663 P.2d at 238.

At trial, the defense suggested that the child made up the story to expedite her return to Mississippi. There is unquestionably evidence that the child did want to return to her mother, who lived in Mississippi, and this desire was expressed to others *before* the child made her accusation to the police and told the social worker her story. Indeed, the child's friend, Becky, had suggested that reporting the defendant's conduct might result in the child's return to Mississippi.

Of course, it is entirely possible that the defendant's misconduct was the reason for the child's desire to return home, and both parties, the state in particular, argue at length as to whether the evidence did in fact show a motive to fabricate and just when that motive arose. We need not analyze those arguments in detail because the crucial point is that the defendant never suggested that the statements made to the police and the social worker were a *recent* fabrication. The essence of this facet of his defense was that any accusation, *whenever made*, was a fabrication. Nothing in the evidence brings this case within the exception expressed in Rule 801(d)(1). The testimony of the police officers and the social worker as to what the child told them should not have been admitted in evidence.

 In reaching our conclusion, we do not ignore the fact that one ground which the state sought to use to justify the admission of these hearsay statements was that the child, after she returned to Mississippi and talked to her father, had recanted her accusation. *See State v. Moran*, 151 Ariz. 378, 728 P.2d 248 (1986). The defense removed this basis for admissibility by foregoing any use of the recantation. The state later brought out the evidence of recantation in direct examination of the child. Just why the state did this is difficult to say. Perhaps it was to dovetail the

evidence with the testimony of the state's expert witness to the effect that molested children often recant. In any event, none of this evidence of recantation justifies the admission of the hearsay evidence.

■ There is one case, not referred to by either party and apparently not considered by the trial judge, that we have considered because it has a bearing on this question of the use of consistent hearsay accusations. In *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801 (1987), the supreme court held that it was not error to admit prior statements that a child had made to other people because they were permitted under Rules 803(24) and 804(b)(5), Arizona Rules of Evidence, the catchall exception for hearsay which permits the admission of testimony which has reliable circumstantial guarantees of trustworthiness and which is more probative than any other evidence that the proponent can reasonably offer. The court looked to the following factors to assess reliability: spontaneity of the statements, consistency of the statements, unusual sexual knowledge on the part of the child, corroboration by physical evidence and the motivation of the parties to whom the statements were made.

We do not believe that *Robinson* can save the state's position. First and most important, the victim in *Robinson*, unlike the child in this case, was unavailable to testify. The state had a special need in *Robinson* to use the hearsay evidence. If we look to Rule 803(24) of the Rules of Evidence, under which the availability of the declarant is immaterial, the hearsay evidence simply does not meet the requirement of being more probative on the point for which it is offered than any other evidence the state could have procured through reasonable efforts.

Second, the factors set out in *Robinson* which a court should weigh on this issue do not particularly favor the state. The only statement which was spontaneous was the one the child made to her friend, Becky. The statements were relatively consistent, but as *Robinson* and a later decision which discussed *Robinson*, *State v. Allen*, 157 Ariz. 165, 174, 755 P.2d 1153, 1162 (1988),

point out, consistency is not a guarantee of trustworthiness. *Robinson*, 153 Ariz. at 201, 735 P.2d at 811. There is nothing unusual about the sexual knowledge that this twelve-year-old child displayed, particularly since she had suffered molestation previously. There was some corroboration for the child's account. Semen stains were found on the quilt on which she said the defendant had ejaculated. There was, however, considerable dispute about the source of these stains, and there was another explanation for their presence. There is nothing in the record to suggest that the persons to whom the statements were made were biased.

On balance, there is nothing either particularly suspicious or particularly compelling about the child's statements. Were we to apply *Robinson* and broaden Rule 24 to this extent, there would be little left of the general rule that such hearsay, which is highly prejudicial, is inadmissible.

## EXPERT TESTIMONY REGARDING BEHAVIORAL CHARACTERISTICS OF CHILD MOLESTERS AND THEIR VICTIMS AND THE CREDIBILITY OF THE CHILD

The defendant asserts that it was error to allow an expert witness to comment on the behavioral characteristics of child molesters and their victims. The parameters of this type of evidence were explained by our supreme court in *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983); *State v. Lindsey*, 149 Ariz. 472, 720 P.2d 73 (1986); and *State v. Moran*, 151 Ariz. 378, 728 P.2d 248 (1986).

*State v. Chapple* was a prosecution for murder in which the supreme court held that it was error to preclude the defendant from calling an expert witness to testify about factors that affect the reliability of eyewitness identification. The court specifically noted that the "generality" of the proffered testimony was a factor which favored its admission. *Chapple*, 135 Ariz. at 292, 660 P.2d at 1219. In summarizing why the evidence should have been admitted, the court said:

The testimony offered was carefully limited to an exposition of the factors affecting reliability, with experimental data supporting the witness' testimony and *no attempt was made to have the witness render opinions on the actual credibility or accuracy of the identification witnesses.* Issues of ultimate fact may be the subject of expert testimony, but witnesses are not 'permitted as experts on how juries should decide cases.'

*Chapple,* 135 Ariz. at 295, 660 P.2d at 1222 (emphasis added).

*State v. Lindsey* was a prosecution for incest and sexual exploitation. The state called an expert witness to testify concerning the behavior patterns of victims of "in-home incestuous-type molesting." The supreme court observed that it was proper to allow such a witness to testify that child victims may display certain behavioral patterns such as recantation, conflicting versions of events, confusion, and inarticulate descriptions. The court then turned to the narrower problem of whether it was permissible for such an expert to go beyond the description of general principles of behavioral science and give specific opinions as to the credibility of a particular witness. The expert had been allowed to testify that only a small percentage of people claiming to be victims of incest lie, and the expert felt "that [the alleged victim] is consistent with someone who had been sexually abused by living at home with her father" and that "I think the likelihood is very strong.... I feel there's a preponderance of the evidence here." *Lindsey,* 149 Ariz. at 474, 720 P.2d at 75.

The supreme court reversed because it disapproved of allowing an expert to tell the jury "who is correct or incorrect, who is lying, and who is truthful," such being tantamount to expert evidence on the question of guilt or innocence. *Id.* The court, for emphasis, stressed that it is the *generality* of the evidence which militates in favor of its admission. The court summarized its holding as follows:

Thus, even where expert testimony on behavioral characteristics that affect credibility or accuracy of observation is allowed, experts should not be allowed to give their opinion of the accuracy, reliability, or credibility of a particular witness in the case being tried. Nor should such experts be allowed to give opinions with respect to the accuracy, reliability or truthfulness of witnesses of the type under consideration.

*Id.* at 475, 720 P.2d at 76.

*State v. Moran* also involved a charge of child molestation and sexual abuse in which the prosecuting witness, who was the daughter of the defendant, recanted her accusation when she testified at trial. The state, under these circumstances, was permitted to use the daughter's out-of-court statements, which were bolstered by the testimony of expert witnesses that the daughter's recantation was typical of molested children and that her out-of-court statements were true. The supreme court, citing its earlier decision in *Lindsey,* reaffirmed its position that evidence about the behavioral characteristics of victims in sexual abuse cases is admissible if it will assist jurors in areas that are apt to be beyond their knowledge and experience. It went on to say, however, that the consideration of whether to admit particularized testimony about credibility was not a question that calls for the trial court to balance the usefulness of such evidence against its prejudicial effect. The court observed that with proper information the jury is as capable of evaluating credibility as an expert. It went on to find that the following question and answer were improper:

Q. Doctor, overall were the findings that you got with regard to [the daughter] on these objective personality tests consistent with an individual who had in fact some kind of trauma like a molest occur early in life and were now simply reacting to that in adolescence?

A. Yes, it is consistent.

*Moran,* 151 Ariz. at 385, 728 P.2d 254.

The court said:

This type of testimony—indicating that the victim's behavior is consistent with the crime having occurred—is slightly different than direct testimony on the victim's veracity. However, like the tes-

timony disallowed in *Lindsey* and the expert's assertion in this case that penetration occurred, the inference offered the jury is that because this victim's personality and behavior are consistent with a molest having occurred, the crime must have been committed.

\* \* \* \* \* \*

Once the jury has learned the victim's behavior from the evidence and has heard experts explain why sexual abuse may cause delayed reporting, inconsistency, or recantation, we do not believe the jury needs an expert to explain that the victim's behavior is consistent or inconsistent with the crime having occurred.

*Id.* at 385, 728 P.2d at 255.

 To summarize then, an expert witness may testify about the general characteristics and behavior of sex offenders and victims if the information imparted is not likely to be within the knowledge of most lay persons. The expert may neither quantify nor express an opinion about the veracity of a particular witness or type of witness. The expert may not explain that, based upon the characteristics and behavior he has described, a person's conduct is consistent or inconsistent with the crime having occurred.

With these principles in mind, we turn to the evidence in the case before us. We find that the testimony of the state's expert witness, Dr. Jeffrey Harrison, a psychologist, violated the principles set out above in three ways. First, much of what the expert testified to, particularly with respect to what he called a "conceptual model" for judging a child's veracity, is information that is within the common knowledge of everyone. Hence, it was not the proper subject of expert testimony. Second, Dr. Harrison was allowed to relate general characteristics of molesters and their victims to the specific facts of this case. Third, he was allowed to express an opinion about the veracity of the child.

### 1. IMPROPER SUBJECT MATTER OF EXPERT TESTIMONY

 Our courts have established four criteria to determine the admissibility of expert testimony, one of which is that the offered evidence must be a proper subject for expert testimony. *Chapple*, 135 Ariz. at 291, 660 P.2d at 1208. The test is "whether the jury is qualified without such testimony 'to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject....'" *Id.* at 293, 660 P.2d at 1220.

Dr. Harrison testified about the basic strategies child molesters employ. He explained that molesters often behave progressively, going from insinuation, to exposing themselves, to masturbation, to fondling, to penetration. He advised the jury that twenty percent of all children are abused and that financial problems and alcoholism, both of which the defendant arguably suffered from, are "stressors" which can trigger men to molest children.

Dr. Harrison testified that one problem with children who have been molested is that after they make an allegation they may minimize, suppress, or deny the experience. In determining whether the original allegations are true, he testified that clinicians rely on a conceptual model, such as the credibility assessment procedure developed by Max Stellar of Keil University in Germany, and the eleven principles on which this model is based. He went on to describe these principles as follows:

The first one is called clarity, and that is defined as how clear and age appropriate are the statements of the child. [The child's vocabulary needs to be age appropriate.]

\* \* \* \* \* \*

[T]he second is celerity which is defined as the lengths of time after the last event and the disclosure....

\* \* \* \* \* \*

The third is the certainty of the subject. How sure is the victim that this actually happened?

\* \* \* \* \* \*

[Fourth] Consistency ... over the course of the repetition of those stories,

is a story the same? Do the same facts come out? Do the same details come out? Is the process the same?

* * * * * *

[Fifth] The next is elaborated details, and again, these have to be age appropriate descriptions of the act and using age appropriate vocabulary. And this is detail and—the detail has to be consistent with the act itself.

* * * * * *

The sixth is specific action, which is related to elaborate details. [The child must be able to demonstrate the act she alleges—through physical gestures, use of dolls or drawings.]

* * * * * *

The seventh is context. The allegation has to occur in a context where it's plausible.... And so it has to be placed in the place where that window of opportunity would have allowed the behavior to occur.

* * * * * *

The eighth is an important one. It relates to the secrecy phase, and it's called secrecy details....
You have to ask the child: Why didn't you tell? What kept you from telling? [Clinician needs to find objective reasons why the child would not have told of the molest.]

* * * * * *

The ninth criteria is the affective details. There needs to be emotional congruence between how the child is feeling when he or she talks about it and the behavior that occurred, effective appropriateness to the situation.

* * * * * *

[T]he tenth are what are called the indicators of sexual abuse, and they are under that heading of four traumagenic dynamics that occur.

* * * * * *

[The four traumagenic dynamics are:] Traumatic sexualization, and this is where the child will inappropriately display sexual behavior.

The second is the theme of betrayal, and behaviorally what you'll see in the child is grief, depression and possibly regressive behaviors....
[T]he third dynamic, though, that's disempowerment, and the child experiences that behaviorally as anxiety, often increase in fears and phobias. [The child feels helpless].
The fourth is stigmatization, and that is as I've mentioned before, the internalization in the child of guilt, blame, shame, responsibility, et cetera.

* * * * * *

Another important factor in determining the truthfulness of the allegation is the eleventh criteria, and that is the vulnerability of a child, and there are children who are at higher risk than other children to be abused.

He went on to say that children who have been abused before, who have an ineffective or absent non-molesting parent, who lack self-protective skills, who have stepfathers or other male relatives present in the home, and who lack sexual knowledge are more vulnerable to molestation. He also said that younger children are more vulnerable than older ones.

To these eleven principles Dr. Harrison added another six. He testified that one must ask whether the child is psychotic, mentally retarded, or has been brainwashed. He said that children will lie to gain a reward, and that children with character disorders or personality disturbances often do not tell the truth.

Much of the foregoing testimony was proper, although only marginally so. Some, we believe, was improper because it is within the common knowledge of the average person. It is true that the average person may not think of these indicators of veracity as "principles," but the average person, in making common sense decisions about veracity, utilizes them frequently. For example, the average person doesn't need the opinion of an expert to know that clarity, certainty, consistency, and plausibility are all touchstones of veracity and that the appearance and manner of the person

who is relating a story may be a key to that person's truthfulness. Nor would the average person need to be advised that psychotic children, or those who have been brainwashed, or those who have been promised a reward, or those who have character disorders or personality disturbances need to be evaluated more carefully.

We would not reverse on this point alone. We do not find Dr. Harrison's expert testimony on many of these commonplace points to have been highly prejudicial, because this testimony was simply a foundation for some of the points that were the proper subject of expert testimony. Nonetheless, his reduction of the commonplace to a "conceptual model" supported by a "system of principles" tended to overemphasize these points and when taken with his other opinions, amounted to error.

## 2. RELATION OF GENERAL CHARACTERISTICS OF MOLESTERS AND THEIR VICTIMS TO THE FACTS OF THIS CASE

■ Dr. Harrison also testified at length about the general characteristics of child molesters and their victims. The doctor commenced his testimony with a discussion of the five phases of a sexual molestation: (1) engagement, (2) overt sexual activity, (3) secrecy, (4) disclosure, and (5) denial and suppression. The engagement phase consists of four strategies commonly employed by molesters to engage their victims in sexual activity: (1) enticement, (2) entrapment, (3) threat of force or injury, and (4) use of force or injury.

In the course of asking "hypotheticals," the prosecutor, on a number of occasions, asked Dr. Harrison whether the specific facts of this case, taken directly from testimony of the victim and other witnesses, fit into the child molesting pattern that he had described. For example, the doctor testified that one of the techniques that child molesters employ is to threaten their victims. The child in this case had testified that the defendant had once grabbed her by the throat and told her that she should tell no one what he was doing and that if she did, he would "make [her] life misera-

ble, financially, emotionally, and physically."

The state elicited the following evidence from Dr. Harrison:

Q. How would you interpret grabbing a child by the throat? Is that—which one [of the engagement strategies] would that fit into?

A. I would interpret that as a use of physical force.

Q. What about a statement to the effect of 'I will make your life miserable, emotionally, financially'—'emotionally, financially'? What kind of—how would you interpret that kind of statement?

A. Without knowing the facts about the statement, it—it appears to be a—verbal threat, and it would fit that third strategy [the threat of force without actually using it].

Defense counsel objected on the grounds that the witness ought not be testifying about whether the child was telling the truth or not, and the prosecutor responded:

These are hypothetical questions, your Honor, based on facts that have been brought out during the trial, and I'm not asking him to evaluate the credibility of the witness. *I'm asking him to evaluate certain facts that have occurred and analyze those facts as they've been presented in evidence.* (Emphasis added.)

The court overruled the objection.

A previous witness, Officer Shawkey, the detective who investigated the child's claims, testified that the child told him that her uncle once stated that her [the child's] mother would not send any money to enable the child to return home to Mississippi. The prosecutor then questioned Dr. Harrison regarding this type of remark.

Q. A statement to the effect of '[y]our mother will not send money to take you home and will not help you': What type of statement would you—how could you categorize that statement if it was made in the connection with a sexual assault of some type?

A. I would probably, again not knowing all the details, in that context place that

in the category of an—of the entrapment strategy.

The child testified that her uncle called her dirty names, that he called her a liar, and that he was physically abusive, kicking and hitting her. Dr. Harrison then testified to the correlation between the uncle's conduct and that of molesters in general:

Q. Would an example of that type of conduct [attribution of blame] on the part of the suspect be calling the child a liar, or calling her names?

A. Probably. That is one possibility.

\* \* \* \* \* \*

Q. Could you explain why someone who was engaged in child molesting activity with a victim would call a victim names, dirty names, or call her a liar?

\* \* \* \* \* \*

A. I would say the primary reason for doing that would be to instill shame, guilt and responsibility for the act.... [B]ut it also could serve the purpose of sexualizing the child. If you teach them the—the language of sex, that again piques their curiosity and raises that sexual thermostat that I talked about, so it could have two purposes, primarily the former.

\* \* \* \* \* \*

Q. Would physical abuse of a child be— would it go along with the secrecy phase, hitting and kicking a child, especially if it occurred because the child indicated that he or she wanted to get away from the molesting or from the house?

A. Well, I think I answered the question already, that one of the four strategies for engagement and secrecy is violence or the threat of violence. So my answer would be yes.

\* \* \* \* \* \*

Q. Well, let me ask you a hypothetical question, Doctor: If you have a child who's been molested at some point in her life and once that that's disclosed, the molester admits it and then kills himself and the child is blamed by her father for that person's death, is there anything that would explain why that child would tell her father a second molestation had not occurred?

A. If a child was molested and the molester committed suicide and the child was not properly treated, I would say that the internalization of guilt in that child would certainly suggest that they would want to retract a story about another molestation.... That's an incredibly high level of guilt for a child to carry.

Still another example of Dr. Harrison testifying from facts previously introduced into evidence was predicated on testimony which the child had given about the letter she had written her mother. The doctor's answer, in the context of the prosecutor's fact specific question, invaded the province of the jury. This occurred as follows:

Q. If a child was being sexually assaulted in some way and the child wrote a letter to her mother and said something to the effect of 'He wants to' and left that unfinished, how would you characterize that type of disclosure?

[DEFENSE ATTORNEY]: Again, your Honor, I'm going to object. I don't believe it's proper ... for this expert to testify as to that.

THE COURT: Overruled.

THE WITNESS: First, let me say that in an indirect purposeful disclosure, the use of a letter ... Mom will catch it ... And then the child has permission to say ... daddy has been doing the things I wrote about in my homework paper or whatever.

Specifically, the state's "hypothetical" questions were nothing more than the expert explaining to the jury how the child's testimony was, in fact, consistent with the crime having occurred. This was condemned in *Moran*.

### 3. EXPRESSION OF OPINION ABOUT THE CHILD'S VERACITY

Finally, in conjunction with his testimony about the "conceptual model" for testing veracity, Dr. Harrison gave his opinion on the correlation between the victim's actions and the veracity criteria. In particular, he said that one of the eleven principles employed by clinicians to evalu-

ate the truthfulness of an allegation is a combination of "traumagenic dynamics" called the indicators of sexual abuse. One of these is stigmatization, whereby the child internalizes the guilt, shame, blame, and repositioning of the molestation. Once again, based on prior testimony about the victim's behavior, Dr. Harrison applied a general discussion of stigmatization to this particular victim.

Q. Does it also include—self-destructive behavior, does that include doing your—yourself harm in the sense of like physical harm?

A. Yes.

Q. Chewing on yourself or digging your hands with your fingernails, something along those lines?

A. I would say that if a child who has been molested, that type of self-destructive behavior would be a result of the shame and the guilt.

Dr. Harrison also said that the opportunity to gain a reward serves as a motivation for children to lie about the occurrence of a sexual molestation. In describing this principle of secondary gain, he related segments of the victim's testimony and refuted the notion that she may have perceived a reward for her allegations.

Q. Do you consider a child that has—that is—that may be homesick but has been told that she can go home at any time and in fact has had people arrange to send her home—do you consider the making of sexual allegations there—let me rephrase this. Do you consider that there is a secondary gain for that child to make allegations to get home faster?

[DEFENSE ATTORNEY]: Your Honor, I'm going to object to that question.

THE COURT: Overruled.

THE WITNESS: Let me digress for just a moment. To have secondary gain as a factor, there must be something blocking the child from what they want, from the payoff, from the outcome, and the purpose of the lie is to overcome that roadblock to the desired goal.

In the situation you described, if the child is allowed to go directly from where they are to the goal without obstruction, there would be no purpose for—there's no secondary gain period, so there would be no purpose for lying.

\* \* \* \* \* \*

Q. It is possible a child would want to go home because a child was being molested?

A. And that would be a protective device, yes.

Q. But that would not be related to secondary gain, in your opinion?

A. I don't believe so, no.

Dr. Harrison's testimony went beyond what our supreme court has said is permissible. Essentially, he was allowed to testify as to the believability of the victim in violation of *Lindsey* and *Moran*. When Dr. Harrison related each of his credibility factors to the specific facts of this case, he was really testifying that the victim was truthful and not lying. His testimony was "nothing more than advice to [the] jurors on how to decide the case." *Moran*, 151 Ariz. at 383, 728 P.2d at 253.

After reviewing the evidence, we cannot say that the errors which occurred in the trial were harmless. It was the victim's word against the defendant's. The physical evidence was inconclusive. We cannot say that, beyond a reasonable doubt, the errors did not affect the verdict. *See Lindsey*, 149 Ariz. at 477, 720 P.2d at 78; *State v. Allen*, 157 Ariz. 165, 755 P.2d 1153 (1988).

We have not overlooked the state's argument that the defendant waived any objection to much of Dr. Harrison's testimony because in his pretrial motion *in limine* he objected only to testimony concerning the "sexual abuse syndrome." This, according to the state, was too narrow to constitute an objection to testimony about the dynamics of child molestation and the characteristics of child molesters. We disagree. As the discussion of the testimony shows, the issues were intertwined, and even if they were not, the defense counsel's repeated objections at various points in the testimony were sufficient to preserve the issue.

Our decision renders moot the defendant's remaining claim of error relating to

the state's supposed failure to timely disclose evidence.

For the reasons stated herein, the convictions are reversed and the case is remanded for new trial.

JACOBSON, Acting P.J., and CLABORNE, J., concur.