NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

STANLEY SHANE SELF, *Appellant.*

No. 1 CA-CR 15-0843
FILED 11-17-2016

Appeal from the Superior Court in La Paz County
No. S1500CR8659
The Honorable Samuel E. Vederman, Judge
The Honorable Michael Irwin, Judge (Deceased)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By David A. Simpson
*Counsel for Appellee*

David Goldberg Attorney at Law, Fort Collins, CO
By David Goldberg
*Counsel for Appellant*

## MEMORANDUM DECISION

Chief Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Andrew W. Gould and Judge Kenton D. Jones joined.

**B R O W N**, Chief Judge:

¶1        Stanley Shane Self ("Defendant") appeals from his convictions and sentences for two counts of child molestation and one count of sexual conduct with a minor.  For the reasons that follow, we affirm.

## BACKGROUND[1]

¶2        When the victim was about six years old, her mother ("Mother") began a romantic relationship with Defendant and he soon moved into the victim's home.  On a day when the victim was home ill, Defendant entered her bedroom, "told [her] he had something that would make [her] feel better," and then proceeded to touch her arms, chest, stomach, and genitals. The victim questioned what Defendant was doing, and he was verbally nonresponsive.  After approximately thirty minutes, Mother returned home from work and Defendant abruptly stopped touching the victim, instructing her not to disclose what happened or "he would whip [her]."  Scared that Defendant would hurt her, the victim did not discuss the incident with anyone.

¶3        Similar abuse happened frequently for years, accompanied by threats of physical punishment.  Initially, the abuse was limited to Defendant's oral and manual contact with the victim's genitals.  Over time, however, Defendant required the victim to perform oral sex on him and, after the family moved to Arizona, Defendant began attempting sexual intercourse with the victim, who was now ten years old.

¶4        One evening, the victim's friend and classmate, N.C., spent the night at the victim's home.  During the night, Defendant woke the victim and led her to a different area of the home to perform a sex act.  When N.C. inquired where she had been, the victim revealed what Defendant had

---

[1]        We view the facts in the light most favorable to sustaining the verdicts.  *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

done. Thereafter N.C. told another classmate, V.L., that Defendant was sexually abusing the victim. The victim asked her friends not to tell anyone else because she feared she would be "beat." Nonetheless, V.L. told her older sister and mother, and V.L.'s mother reported the sexual abuse to Mother. Mother confronted Defendant with the allegations and he immediately left the home.

¶5         Several months later, Defendant and Mother reconciled and Defendant moved back into the home. Approximately a month after Defendant returned, he also resumed his sexual abuse of the victim. Rather than threatening to "whip" or "beat" the victim, however, Defendant began threatening that he would kill her if she talked about the abuse.

¶6         During the spring of that school year (1982 – 4th grade), the children of a neighboring family stayed at the victim's home for two weeks while their father was hospitalized. Defendant sexually abused the victim during this time period and one of the children, A.H., observed the Defendant sexually abusing the victim. Moments later, he saw the victim exit the home while "spitting and wiping her mouth." A.H. reported what he had witnessed to his school teacher. Around the same time, N.C. informed the same school teacher that Defendant was sexually abusing the victim.

¶7         The school teacher questioned the victim about the allegations and she confirmed the abuse. On May 12, 1982, the school teacher reported the abuse to the Arizona Department of Economic Security ("ADES"). The school teacher then contacted Mother and expressed concern that the victim was crying every day at school. The next day, Defendant drove to the school, told the school teacher "he didn't appreciate [the school teacher] getting involved in his family," and threatened him with physical harm.

¶8         On May 15, 1982, while Mother was at work, Defendant woke the then eleven-year-old victim and forced sexual intercourse, threatening to kill her if she told anyone. The next evening while Mother was at work, Defendant attempted sexual intercourse with the victim but the victim was able to fight him off, after which he hit her knee with a board.

¶9         On May 17, 1982, two ADES employees, Wayne Wallace and John Cook, met with the victim at school to discuss the abuse allegations. After the victim disclosed the nature of the sexual abuse, she was removed from the home and taken into ADES custody.

¶10        On May 18, 1982, Sherman Meyer, M.D., conducted a physical examination of the victim at the behest of ADES.  Based on the results of the exam, demonstrating that the victim's hymen had been completely "broken," Dr. Meyer concluded the victim had been subjected to sexual intercourse.  Because no blood or other evidence indicating "a recent break of the hymen" was present, Dr. Meyer opined that some time had passed since the victim's hymen was "broken down."

¶11        In 1986, Defendant was indicted on two counts of child molestation and one count of sexual conduct with a minor (for acts occurring on or about May 15, 1982 and May 16, 1982).  He was released on bond, but failed to appear at trial.  After the trial court found that Defendant had voluntarily absented himself, he was tried in absentia.  The jury found Defendant guilty as charged.

¶12        The trial court issued a warrant for Defendant's arrest in September 1986, but he was not apprehended until February 2015.  The court then sentenced Defendant to a presumptive term of one and one-half years' imprisonment on the count of sexual conduct with a minor, a concurrent, presumptive term of seven years' imprisonment on one count of child molestation, and a consecutive, presumptive term of seven years' imprisonment on the remaining count of child molestation. Defendant timely appealed.

## DISCUSSION

### I.        Expert Testimony

¶13        Defendant argues the trial court improperly permitted the State's expert witnesses, Wayne Wallace and Daniel Wynkoop, to vouch for the victim's credibility.  Specifically, Defendant contends that the experts' testimony regarding the probability that children who report sexual abuse are being truthful was inadmissible.

¶14        We generally review a trial court's admission of expert testimony for an abuse of discretion, *State v. Salazar-Mercado*, 234 Ariz. 590, 594, ¶ 13 (2014), recognizing the trial court is in the best position to weigh "the usefulness of expert testimony against the danger of unfair prejudice" when addressing "fact-bound inquiries," *State v. Moran*, 151 Ariz. 378, 381 (1986).  However, our supreme court has determined that "certain types of expert opinion evidence will not assist juries in sexual abuse cases" and are thus inadmissible as a matter of law.  *Id.* (citing *State v. Lindsey*, 149 Ariz. 472, 475 (1986)).

¶15 On direct examination, Wallace testified that for ten years he worked as a deputy sheriff in California and had been working the past several years at the Department of Economic Security. At the time of the interview with the victim, he was the Child Welfare Supervisor for Parker and Lake Havasu. Wallace stated he had handled forty to fifty child molestation and child sexual abuse cases in his experience working in child welfare. The prosecutor then briefly explored whether the victim's behavior in this case was typical for a sexual abuse victim. Without objection, Wallace responded that the victim's initial reluctance to discuss the abuse was characteristic of sexual abuse victims. Wallace explained that based on the victim's allegations, his observation of a bruise on her leg, and speaking with the victim's mother, the decision was made to remove the victim from the home.

¶16 On cross-examination, defense counsel referred to Wallace's direct testimony regarding his prior experience and asked whether it would be "more proper[]" to say that he had handled forty to fifty cases involving *allegations* of child molestation rather than forty to fifty child molestation cases. Wallace agreed. Defense counsel then asked whether it was "possible for a child to make an allegation" that was not true. Wallace acknowledged there was a "slight chance of that."

¶17 On redirect, the prosecutor asked, over objection, "how many times did it come up that you had an alleged victim that was . . . lying about the whole thing?" Wallace answered that "in at least 95 percent of the cases, we have substantiated the child's truthfulness to the point where we could file a dependency on the child." The prosecutor then asked, over objection, about the other five percent of the cases and Wallace responded that those cases involved children who were too young "to be approached on the subject," situations in which there was no medical confirmation, or matters in which the family left the area before ADES was able to fully investigate. Shortly after trial commenced the following morning, defense counsel asked that the record clearly reflect that he had objected to Wallace's "use of percentages," and the trial court noted that the objections had been made.

¶18 The State then called psychologist Daniel Wynkoop to testify regarding his psychological evaluation of the victim. During the interview portion of his evaluation, the victim expressed great anger that Mother had resumed a relationship with Defendant after learning of the sexual abuse. Without objection, Dr. Wynkoop testified that the victim's feeling of parental abandonment was typical of sexual abuse victims. The prosecutor then questioned Dr. Wynkoop about the various tests and assessments the victim completed during the evaluation and asked whether any of the

results indicated that the victim was a "pathological liar." Without objection, Dr. Wynkoop responded "there was no evidence to suggest in any way that [the victim] was a pathological liar." After Dr. Wynkoop explained that the results demonstrated the victim understood the difference between right and wrong and truth and a lie, the prosecutor asked Dr. Wynkoop to opine, "[w]ithout going to the ultimate question," whether the victim had actually been subjected to sexual abuse. Dr. Wynkoop answered that, given the victim's detailed and consistent accounts, "statistically at least . . . there was a chance that she was absolutely telling the truth." Defense counsel objected and the trial court ordered the statement stricken.

¶19    On cross-examination, defense counsel asked whether Dr. Wynkoop had ever been involved in a case in which allegations of sexual abuse were not truthful and Dr. Wynkoop answered he had never personally been involved in such a case, but was aware that such cases have occurred. Dr. Wynkoop also testified, however, that "the data continually say[s] that children tend not to lie."

¶20    When the prosecutor followed-up on this testimony during redirect, Dr. Wynkoop testified that "the data" reflects that children make false allegations of abuse in "as many as" five percent of cases involving custody or child support, but in only "one percent" of cases unrelated to domestic relations. Defense counsel objected and the trial court ordered "the last portion of the answer relating to percentages" stricken.

¶21    As explained by our supreme court in *Lindsey* and *Moran*, "[c]hildren who have been the victims of sexual abuse or molestation may exhibit behavioral patterns (e.g. recantation, conflicting versions of events, confusion or inarticulate descriptions) which jurors may attribute to inaccuracy or prevarication, but which may be merely the result of immaturity, psychological stress, societal pressures or [other] similar factors[.]" *Lindsey*, 149 Ariz. at 474; *see also Moran*, 151 Ariz. at 381. For this reason, a trial judge has discretion to allow expert testimony regarding "general patterns of behavior" to aid jurors who may be "unfamiliar with the behavioral sciences." *Lindsey*, 149 Ariz. at 473; *see also Moran*, 151 Ariz. at 381 (explaining "[s]uch evidence may harm defendant's interests, but we cannot say it is *unfairly* prejudicial; it merely informs jurors that commonly held assumptions are not necessarily accurate and allows them to fairly judge credibility").

¶22    In no circumstance, however, may the court admit "direct testimony on the question of credibility." *Lindsey*, 149 Ariz. at 474; *see also*

*Moran*, 151 Ariz. at 382, 385. Indeed, "[s]uch testimony is tantamount to expert evidence on the question of guilt or innocence." *Lindsey*, 149 Ariz. at 474; *see also Moran*, 151 Ariz. at 383. Accordingly, an expert may neither opine regarding the likelihood that a particular witness is truthful nor that "a certain percentage" of witnesses in general are truthful. *Lindsey*, 149 Ariz. at 475; *Moran*, 151 Ariz. at 382. Stated differently, expert testimony that quantifies the probability that another witness is credible is inadmissible. *Lindsey*, 149 Ariz. at 474; *Moran*, 151 Ariz. at 382. Based on *Lindsey* and *Moran*, the expert testimony setting forth probabilities that a child's allegations of sexual abuse are truthful, was inadmissible.[2]

**¶23** The trial court struck Dr. Wynkoop's probabilities testimony as well as his opinion that the victim may be telling the truth, and properly instructed the jury not to consider any testimony that was ordered stricken from the record. Because defense counsel did not solicit any additional instruction for the jury or move for a mistrial, we need not further address these errant statements that were properly struck from the jury's consideration. *See Payne*, 233 Ariz. at 513 (noting "the trial court sustained several objections and issued curative instructions" after the prosecutor posed improper questions, and "[w]e assume the jurors followed those instructions"); *see also State v. Dann*, 205 Ariz. 557, 570, ¶ 46 (2003) (noting the trial court issued a limiting instruction to cure improper testimony and, absent defense counsel's request for "further guidance for the jury, we assume the jurors followed the court's instruction"); *State v. Schroeder*, 167 Ariz. 47, 50-51 (1990) (concluding any prejudice caused by an expert witness's testimony regarding the credibility of the victim was cured when the trial court sustained defense counsel's objection and admonished the jurors not to consider it).

**¶24** To the extent Defendant also challenges Dr. Wynkoop's testimony on cross-examination that he has never had a case involving false allegations of sexual abuse and "the data" reflects "children tend not to lie,"

---

[2] As noted by the State, unlike Dr. Wynkoop, Wallace did not testify to a percentage of truthful sexual abuse allegations generally, but rather testified regarding the percentage of allegations he had personally handled that had been deemed truthful. Because this testimony nonetheless pertained to the "accuracy, reliability or truthfulness of witnesses of the type under consideration," we do not find this distinction meaningful and conclude that experience-based probabilities testimony, like its data-driven counterpart, invades the province of the jury to assess credibility. *Lindsey*, 149 Ariz. at 475.

we conclude Defendant invited the error, if any. *See Lindsey*, 149 Ariz. at 477 (explaining a party waives any claim of error when the party "procures the admission of [the] improper evidence"). Defense counsel specifically asked Dr. Wynkoop whether he had ever been involved in a case in which allegations of sexual abuse were not truthful and whether, based on his "training," there "is evidence to believe that children will make unfounded allegations of child abuse." Dr. Wynkoop's answers were responsive to the questions posed by defense counsel. Likewise, to the extent Defendant challenges the admission of Dr. Wynkoop's testimony that the psychological evaluation revealed no evidence that the victim is a "pathological liar," we find no abuse of discretion, much less fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005) (holding fundamental error review "applies when a defendant fails to object to alleged trial error"). On direct examination, the school teacher testified that the victim had "a tendency to tell stories" and admitted that he had described her as a "habitual liar" when interviewed by police. Viewed within this context, Dr. Wynkoop's subsequent testimony that there was no evidence the victim was pathologically unable to recognize truth was not an impermissible attempt to vouch for her credibility, but a proper explanation of the evaluation results in light of testimony that arguably suggested she suffered from a psychological disorder.

¶25        With respect to Wallace's probabilities testimony, however, the trial court erroneously overruled defense counsel's objections. And we reject the State's argument that defense counsel invited the error. Although defense counsel asked Wallace whether it was possible for a child to falsely allege sexual abuse, and Wallace stated that had not been his experience, the prosecutor elicited testimony regarding the percentage of victims who had made truthful allegations.

¶26        When an objection is improperly overruled by the trial court, we review for harmless error. *State v. Bible*, 175 Ariz. 549, 588 (1993). "Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *Id.* "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (citation omitted). The State has the burden of establishing that the error is harmless, which we consider "in light of all of the evidence." *Id.* (citation omitted). "Due to this case-specific factual inquiry, an error may be harmless in one case but require reversal in another." *Id.*

¶27        In *Lindsey* and *Moran*, the supreme court vacated child molestation and sexual abuse convictions after finding that expert testimony regarding truthfulness probabilities was erroneously admitted. In reaching these decisions, the supreme court expressly noted that each case depended on the victim's credibility. *See Lindsey*, 149 Ariz. at 477 (vacating defendant's incest convictions because his guilt or innocence "inherently turned on the question of the [victim's] credibility"); *Moran*, 151 Ariz. at 386, (holding that improper testimony was prejudicial because "[n]either physical evidence or any other direct evidence showed that [defendant] committed the crime. The only evidence was the out-of-court statements, later recanted at trial").

¶28        Here, the evidence supporting the convictions was not limited to the victim's statements. *See State v. Haskie*, 240 Ariz. 270, ¶ 32 (2016) (noting that the expert's testimony "was not the only information upon which the jury could rely to assess [the victim's] credibility"). For example, Dr. Meyer testified that the eleven-year-old victim had been subjected to sexual intercourse, demonstrated a lack of physical discomfort during the examination, and was "overdeveloped" for an eleven-year old. The victim's testimony corroborated the medical evidence. She testified as to a particularized knowledge of sexual acts, and confided in V.L., N.C., and the school teacher about the sexual acts. The school teacher testified that Defendant threatened him with physical harm after the teacher reported the sexual abuse to ADES. Although referencing an incident that occurred a month prior to the charged acts, A.H. testified that when he was staying at the victim's home, he personally witnessed the victim engaging in a sexual act with Defendant. *See supra*, ¶ 6. Defendant sent A.H. a note after the incident, telling him to leave the victim alone and stay out of her business.

¶29        Furthermore, the prosecutor never mentioned anything about Wallace in his opening statement and referred to him once in closing argument, but said nothing about his probabilities testimony. *Cf. State v. Valverde*, 220 Ariz. 582, 585, ¶ 16 (2009) ("In assessing the impact of an erroneous instruction, we also consider the attorneys' statements to the jury."); *State v. Anthony*, 218 Ariz. 439, 446, ¶ 40 (2008) (explaining that the child molestation allegation that was improperly admitted "was not a passing reference, but rather a repeated theme of the State's closing argument").

¶30        Given the nature and context of the error, and the totality of the evidence presented, we conclude beyond a reasonable doubt that Wallace's improper probabilities testimony did not contribute to or affect

the jury's verdict. *See Bible*, 175 Ariz. at 588; *see also Moran*, 151 Ariz. at 383 (explaining that an error caused by expert testimony regarding the victim's veracity may be harmless "[i]n [some] cases"); *State v. Crane*, 166 Ariz. 3, 7 (App. 1990) (concluding that social worker's improper opinion testimony regarding victim's truthfulness was harmless beyond a reasonable doubt); *cf. State v. Tucker*, 165 Ariz. 340, 350 (App. 1990) (holding that testimony of expert witness in violation of *Lindsey* and *Moran* standards was not harmless because it "was the victim's word against the defendant's").

## II. Flight Instruction

**¶31** Defendant contends the trial court erred by giving a flight instruction because it was not supported by the evidence. We review a trial court's decision to give or refuse a requested jury instruction for an abuse of discretion. *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471, ¶ 8 (2005). "A flight instruction should only be given if the State presents evidence of flight after a crime from which jurors can infer a defendant's consciousness of guilt." *State v. Solis*, 236 Ariz. 285, 286 (App. 2014).

**¶32** To determine whether a flight instruction is warranted, we consider two factors. *State v. Smith*, 113 Ariz. 298, 300 (1976). First, we evaluate whether the evidence "supports a reasonable inference that the flight or attempted flight was open, such as the result of an immediate pursuit." *Id.* Second, when there is no open flight, we consider whether the evidence supports "the inference that the accused utilized the element of concealment or attempted concealment." *Id.* Absent evidence supporting either factor, the giving of a flight instruction constitutes error. *Id.*

**¶33** Over defense counsel's objection, the trial court instructed the jury, in relevant part:

> Running away or hiding after a crime has been committed does not in itself prove guilt. You may consider any evidence of the defendant's running away or hiding, together with all the other evidence.

It is undisputed there was no evidence of open flight in this case; however, the State presented evidence that Defendant attempted to conceal his whereabouts after the allegations were reported to authorities.

**¶34** Wallace testified that he attempted to contact Mother and Defendant the day after he met with the victim at school, but quickly learned that Defendant "had left the area." Deputy Hare testified that he

repeatedly attempted to locate Defendant in May 1982, but Defendant's residence appeared deserted. About ten months later, however, Hare received a phone call from an ADES employee notifying him that Mother was at the ADES office. Hare immediately drove to the ADES office and waited for Mother to exit the building. Hare observed Mother walk down the street, turn into an alley, and get into a green van. Hare followed the van and eventually effected a traffic stop. Defendant was the driver of the van and after a short conversation, Defendant agreed to follow Hare to the police station for an interview. Consistent with the trial court's ruling, we conclude the evidence was sufficient to support the flight instruction when the Defendant left his residence shortly after the allegations were reported to authorities and attempted to hide his presence from ADES employees.

**CONCLUSION**

¶35        Based on the foregoing, Defendant's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:   AA