853 A.2d 985

JOHN G. OSTROWSKI AND DOLORES OSTROWSKI, PLAIN-TIFFS–RESPONDENTS, v. CAPE TRANSIT CORP. AND TED M. LIVELY, DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued March 23, 2004—Decided August 2, 2004.

500

Before Judges SKILLMAN, WELLS and C.S. FISHER.

*F. Herbert Owens,* argued the cause for appellants (*Cooper Levenson April Niedelman & Wagenheim,* attorneys; *Gerard W. Quinn,* on the brief).

*Lars S. Hyberg,* argued the cause for respondents (*McAllister, Hyberg, White & Cohen,* attorneys; *Mr. Hyberg,* on the brief).

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

In this personal injury case, the primary issue on appeal is whether defendants' presentation of expert medical opinion testimony that plaintiff was faking his symptoms of a serious brain injury constituted an attack on his character for truthfulness which plaintiff could rebut with evidence concerning his character for truthfulness. We conclude that defendants' evidence constituted an attack on plaintiff's character for truthfulness which plaintiff was properly permitted to rebut by evidence that he is a truthful person.

Plaintiff, John G. Ostrowski, suffered personal injuries on November 18, 1997, when a truck he was driving in the course of his

employment was hit in the rear by a bus. The bus driver testified that the accident occurred as a result of his brakes failing, and he estimated his speed at the time of impact as 20 to 30 m.p.h. As a result, plaintiff's head slammed into his windshield, causing it to break.

Plaintiff and his wife, Dolores Ostrowski, brought this action against the bus driver, Ted M. Lively, and his employer, Cape Transit Corp. Defendants conceded liability, and the case was tried before a jury solely as to damages.

The parties' witnesses presented dramatically different views regarding the seriousness of the injuries plaintiff suffered in the accident. Plaintiff's witnesses testified that he suffered a serious brain injury, as a result of which he is no longer able to work and requires substantial assistance in carrying out normal life functions. Defendants' witnesses testified that plaintiff suffered a mild concussion, which did not cause any permanent consequences, and that he is now able to work and enjoy his other activities in the same manner as before the accident.

One of plaintiff's primary activities was playing a saxophone in the Avalon String Band, which marches in Philadelphia's New Year's Day Mummers Parade. Plaintiff's witnesses testified that he had been one of the best musicians and lead performers before the accident, but even though he has remained in the band since the accident, his skills have diminished significantly and he now plays only a secondary role.

Defendants conducted surveillance videotaping of plaintiff, which purported to show that plaintiff was still an active member of the band. Plaintiff countered with testimony by other band members, who compared videotape footage of plaintiff's performances before the accident with the footage defendants had obtained by their surveillance videotaping.

Plaintiff's claim that he suffered a serious brain injury in the accident was supported by the testimony of four treating doctors, all of whom concluded that plaintiff suffers from serious cognitive

and emotional problems as a result of the accident and that his condition is permanent.

Plaintiff's primary care physician, Dr. Kenneth Winokur, testified that he has seen plaintiff more than one hundred times since the accident. Approximately a month and a half after the accident, plaintiff had blurred vision in his right eye. Plaintiff also had "some right facial asymmetry" and appeared to have "neurocognitive defects." In addition, he "exhibited depression." Based on these preliminary observations and diagnoses, Dr. Winokur referred plaintiff to an ophthalmologist, neurologist and psychiatrist. He also sent plaintiff for treatment at the Magee Rehabilitation Center, which has a closed head injury rehabilitation unit. Dr. Winokur concluded that plaintiff has depression, impotence and neurocognitive deficits. Dr. Winokur also concluded that plaintiff can no longer work or drive a motor vehicle.

Dr. Timothy J. Michals, a psychiatrist who examined plaintiff sixty times, testified that plaintiff has serious deficits in short-term memory and judgment. Dr. Michals concluded that plaintiff should not drive a motor vehicle and cannot work. He also expressed the opinion that plaintiff needs someone with him at all times. Although plaintiff's MRIs and CAT scans did not reveal any injury, Dr. Michals testified that such tests frequently do not show brain injuries.

Dr. Thomas Swirsky–Sacchetti, a clinical psychologist who specializes in neuropsychology, conducted ten hours of neuropsychological testing of plaintiff and concluded that he was suffering from "a moderately severe post-concussion syndrome" and was clinically depressed with a high level of anxiety about his future. Plaintiff also exhibited "deficits in verbal and nonverbal memory, motor sequencing, visual-spacial reasoning, and complex problem solving." Dr. Swirsky–Sacchetti concluded, based on the severity of plaintiff's psychological deficits and the amount of time that had elapsed since the accident, that plaintiff's problems are permanent. On cross-examination, Dr. Swirsky–Sacchetti conceded that the

psychological tests he performed depended on the credibility of plaintiff's answers to his questions.

Dr. Michael Saulino, who specializes in physical medicine and rehabilitation, examined and treated plaintiff at the Magee Rehabilitation Hospital. He concluded that plaintiff suffered a "traumatic brain injury to the left front part of his brain" in the 1997 motor vehicle accident. Dr. Saulino also found a mild physical weakness and impairment of coordination on the right side of plaintiff's body, particularly his arm and leg. He expressed the opinion that plaintiff should not drive a motor vehicle because he would pose a risk to himself and others, and that he cannot return to gainful employment. Dr. Saulino testified that plaintiff should be supervised "in any environment or situation that is complex, that is confusing, that is unfamiliar."

Plaintiff also presented testimony by ten lay witnesses to support his claim that he suffered a brain injury in the accident that has had a serious adverse effect upon his capacity to engage in his former activities, especially playing in the Avalon String Band. Most of those witnesses were band members.

The testimony of Jacob P. Hart is illustrative of this group of witnesses' testimony. Hart described plaintiff as "the driving force" in the band before his accident. He was the band's "ultimate administrator," who dealt with the costume maker, booking agents and food services. Musically, plaintiff's talent was second only to a band member who is a professional saxophonist. Plaintiff was so skilled playing and dancing that he was front and center in the New Year's Day parade, which is where the band's most talented members are positioned. Moreover, plaintiff was the "life of the party" and one of the funniest people Hart had ever met.

However, after the 1997 accident, plaintiff lost his "zest for life, the humor, the up-front personality." He was no longer "deeply involved in all of the intricacies of running the band." Musically, plaintiff could still play but not the way he had in the past. Plaintiff also struggled with the dancing and was no longer lined

up in the front. Instead, he was relegated to the "duck line," which is in the back. People in the duck line do not have to learn all the steps the people in the front perform because they are not seen on television.

The band's director testified that plaintiff had wanted to resign after the accident, but other band members asked him to stay in the band, not because of his ability, but as something they "owe[d]" him for his past dedication. When plaintiff was inducted into the Mummers Hall of Fame, another band member had to deliver his speech because plaintiff was unable to do it himself.

Plaintiff also presented the testimony of the president of Dubin Paper Company, which employed him as a truck driver from 1980 until the accident, and two of his co-workers. They described plaintiff as capable, efficient and hardworking. However, there was a radical change in plaintiff's capacities and demeanor after the accident. While he had been outgoing and friendly before the accident, he became withdrawn and was unable to return to his work. In addition, according to the president, "[h]is speech had completely changed. It was slurred. His movements were somewhat disorganized." One of his co-workers testified that plaintiff would become easily confused:

> He'd be talking about something, he would—then he'd go off, he wouldn't remember, you know, what we were talking about. You'd have to remind him what we were talking about.

Plaintiff's wife testified that plaintiff used to be jovial and active, but that he has become quiet and inactive since the accident. She testified that he used to be an avid reader but is now unable to comprehend what he reads. In addition, plaintiff used to handle the family's finances but she has had to assume that responsibility because even simple bookkeeping is now beyond his capacity. She also has to organize plaintiff's medications and make sure he takes them at the right times. Moreover, she has to drive plaintiff wherever he needs to go.

Plaintiff testified that he was earning approximately $40,000 a year at the time of the accident. He was then forty-two years old

and his pension would have become vested in another three and a half years. Plaintiff planned to retire at that time, obtain a college degree and teach history. However, the injuries he suffered in the accident forced him to stop working, and he no longer has the capacity to attend college. Moreover, according to plaintiff, his saxophone playing sounded like "silk" before the accident but now sounds like "noise." He also can no longer sight-read music.

The defense focused chiefly on plaintiff's veracity, contending that he was faking his brain injury. Defendant presented three medical experts to support this defense. Defendant's expert neurologist, Dr. Daniel M. Feinberg, viewed the surveillance videotapes of plaintiff and concluded that his performance in the parades was "incompatible" with the results of the neuropsychological testing done by his doctors. According to Dr. Feinberg: "There's no way that someone could have had those kinds of testing results and still have been able to play a musical instrument and participate in the activities that he had participated in in the videotapes." However, Dr. Feinberg conceded on cross-examination that despite the "discordance" between the psychological testing and what was seen on the videotapes, he could not state that plaintiff was "absolutely normal" or that "he doesn't have some deficits."

Dr. Joseph Zielinski, defendant's expert in neuropsychology, testified that some of the answers plaintiff gave to the questions he posed in his examination were "not ... very credible." For example, plaintiff paused long periods of time before answering Zielinski's questions about subjects such as the foods he liked to eat, his wife's maiden name and the gender of his youngest child. Dr. Zielinski also stated that there were "discrepancies" in the testing that was performed at the direction of Dr. Swirsky–Sacchetti. For example, plaintiff was able to draw a cube better than a clock face, whereas in his opinion someone who could not draw a clock would not be expected to be able to draw a cube. Plaintiff's handwriting also was inconsistent, sometimes trembling,

sometimes steady. Dr. Zielinski concluded that "[plaintiff] really looks like an individual who is deliberately doing poorly and faking the results."

Dr. Wolfram Rieger, defendant's expert psychiatrist, testified that when he reviewed plaintiff's background with him, plaintiff "took a[n] extra long time to remember when he was born," which Dr. Rieger found difficult to believe. Based on his examination of plaintiff, Dr. Rieger found no signs of cognitive dysfunction and no psychosis. Dr. Rieger concluded that, while plaintiff may have experienced a mild concussion in the accident, he had "fully and completely recovered" and his psychiatric prognosis was "good."

In their attack on plaintiff's credibility, defendants also relied on plaintiff's false statement at his deposition that he had not continued to march in the band after the accident and his failure to disclose to his treating doctors that he had been treated for depression for four years following a 1989 accident that also resulted in litigation.

After hearing this evidence over the course of 13 days, the jury awarded plaintiff $94,828.50 for medical expenses, $2.2 million for other economic damages, and $1.1 million for pain, suffering, disability and loss of enjoyment of life. The jury also awarded Mrs. Ostrowski $416,720 for loss of consortium. The trial court subsequently denied defendants' motion for a new trial and entered judgment in plaintiffs' favor.

On appeal, defendants present the following arguments:

I. BY ALLOWING THE PLAINTIFF TO PRESENT, IN HIS CASE IN CHIEF, A WIDE VARIETY OF WITNESSES WHO TESTIFIED CONCERNING THEIR OPINION OF THE PLAINTIFF'S CHARACTER FOR TRUTHFULNESS AND HONESTY AND HIS GOOD ACTS, THE TRIAL COURT COMMITTED HARMFUL ERROR.

II. THE TRIAL COURT ERRED WHEN IT SEVERELY RESTRICTED THE ABILITY OF DEFENSE COUNSEL TO CROSS–EXAMINE THE PLAINTIFF'S WITNESSES, THEREBY EFFECTIVELY DEPRIVING THE DEFENDANT OF DUE PROCESS.

III. THE CUMULATIVE WEIGHT OF THE ERRORS MADE BY THE
TRIAL COURT NECESSITATES A VACATION OF THE JURY'S VER-
DICT AND A NEW TRIAL ON ALL ISSUES.

IV. THE VERDICT OF THE JURY WAS AGAINST THE WEIGHT OF THE
EVIDENCE.

We reject defendants' arguments and affirm the jury verdict
and judgment in plaintiffs' favor. Defendants' argument that the
trial court improperly restricted their cross-examination of plain-
tiffs' witnesses is clearly without merit and does not warrant
discussion. *R.* 2:11–3(e)(1)(E). We reject defendants' argument
that the verdict was against the weight of the evidence substan-
tially for the reasons expressed in Judge Higbee's October 29,
2002 oral opinion denying defendants' motion for a new trial. We
discuss the arguments set forth under Point I of defendants' brief
in the remainder of this opinion.

I

*N.J.R.E.* 608 provides in pertinent part:

> The credibility of a witness may be attacked or supported by evidence in the
> form of opinion or reputation, provided, however, that the evidence relates only to
> the witness' character for truthfulness or untruthfulness, and provided further that
> evidence of truthful character is admissible only after the character of the witness
> for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Before trial, defendants made an in limine motion to preclude
plaintiff from presenting any evidence concerning plaintiff's char-
acter for truthfulness. In opposing this motion, plaintiff argued
that defendants' medical experts were going to testify that plain-
tiff had been "faking" his symptoms of a brain injury. The trial
court ruled that, in light of this anticipated defense, plaintiff would
be allowed to present evidence concerning his character for truth-
fulness:

> [W]here there's an allegation that someone is fabricating an entire injury ... and
> that most of their symptoms they simply have made up, that they're not true, that,
> in fact, they've tried to deceive everyone, that they are a liar and a fraud, ... that's
> an attack on his character and I'm going to allow him to rebut that with character
> evidence.

Based on this ruling, most of plaintiff's medical and lay witnesses testified that plaintiff has a reputation for being truthful or that in their opinion he is a truthful person.

On appeal, defendants argue that plaintiff failed to establish the requisite foundation for admission of evidence concerning his character for truthfulness. Defendants also argue that this evidence was so prejudicial that a new trial is required.

There is no reported New Jersey case dealing with the foundation required for the introduction of a witness's character for truthfulness under *N.J.R.E.* 608.[1] However, *N.J.R.E.* 608 is similar to the federal evidence rule and the evidence rules in many other states. See 2C *N.J. Practice, Evidence Rules Annotated, R.* 608 (II) comment 1 at 498 (John H. Klock) (3d ed. 2002). Consequently, the decisions in those other jurisdictions provide guidance in interpreting *N.J.R.E.* 608. *See generally* 1 *McCormick on Evidence* § 47 (5th ed. 1999); Wright & Gold, 28 *Fed. Prac. & Proc. Evid.,* § 6116 (1993); Michael A. DiSabatino, *Attacking or Supporting Credibility of Witness by Evidence in form of Opinion or Reputation, Under Rule 608(a) of Federal Rules of Evidence,* 52 *A.L.R. Fed.* 440, 444–46 (1981).

Professor McCormick's treatise contains the following commentary concerning the foundation required for introduction of evidence of a witness's character for truthfulness:

When may the party supporting the impeached witness offer evidence of the witness's good character for truth? Certainly attacks by evidence of bad reputation, bad opinion of character for truthfulness, conviction of crime, or misconduct which has not resulted in conviction, all open the door to character support. The evidence of good character for truth is a logically relevant response in kind to these modes of impeachment. Moreover, a slashing cross-examination may carry strong accusations of misconduct and bad character, which even the witness's denial will not remove from the jury's mind. If the judge considers that fairness requires it,

---

[1] There are a few New Jersey decisions that interpreted former *Evid. R.* 22(c), which was the predecessor to *N.J.R.E.* 608. *See, e.g., State v. Johnson,* 216 *N.J.Super.* 588, 605–07, 524 *A.2d* 826, 834–35 (App.Div.1987). None of those decisions is relevant to the issue presented in this appeal.

he may permit evidence of good character, a mild palliative for the insinuation of a combative cross-examination.

. . . .

Attempts to support the witness by showing his good character for truthfulness have resulted in contradictory conclusions when the witness has been impeached only by evidence of an inconsistent statement or the opponent's evidence specifically contradicting the facts to which the witness testified. If the witness has been impeached by an inconsistent statement, perhaps the numerical majority of courts permit a showing of his good character of truthfulness. However, if the adversary has merely introduced evidence denying the facts to which the witness testified, the greater number of cases forbid a showing of the witness's good character for truthfulness. Convenient as hard-and-fast answers to these seemingly minor trial questions may be, it is unsound to resolve them in a mechanical fashion. A more sensible view is that in each case the judge should consider whether a particular impeachment for inconsistency or a conflict in testimony amounts in effect to an attack on character for truthfulness and accordingly exercise discretion to admit or exclude the character-support. An important consideration is whether the inconsistency or contradiction relates to a matter on which the witness could be innocently mistaken. If the inconsistency or contradiction is so flat that the common sense inference is a lie rather than an innocent mistake, the judge can treat the impeachment as an attack on the witness's truthfulness. This view is arguably codified in the Federal Rules of Evidence.

[1 *McCormick on Evidence, supra,* § 47 at 191–93.]

Although some cases take a more restrictive view, *see, e.g., Pierson v. Brooks,* 115 *Idaho* 529, 768 *P.*2d 792, 795–97 (Ct.App. 1989), the majority of jurisdictions that have addressed the issue follow the general approach set forth in the McCormick treatise in determining whether evidence of a witness's character for truthfulness may be introduced. *See, e.g., United States v. Murray,* 103 *F.*3d 310, 320–21 (3d Cir.1997); *Beard v. Mitchell,* 604 *F.*2d 485, 503 (7th Cir.1979); *United States v. Medical Therapy Sciences, Inc.,* 583 *F.*2d 36, 38–42 (2d Cir.1978), *cert. denied,* 439 *U.S.* 1130, 99 *S.Ct.* 1049, 59 *L.Ed.*2d 91 (1979); *Powell v. Burnett,* 304 *Ark.* 698, 805 *S.W.*2d 50, 53–54 (1991); *Blakely v. Bates,* 394 *N.W.*2d 320, 322–24 (Iowa 1986); *Luck v. Miller,* 240 *Va.* 445, 397 *S.E.*2d 869, 871 (1990). In *Luck,* the court concluded that the cross-examination of a plaintiff in a personal injury accident, which was designed to show that she was seeking to recover for the same injuries she had claimed in a prior lawsuit, constituted an attack on plaintiff's character for truthfulness that entitled her to present evidence of her reputation for truthfulness:

Cross-examination of a witness often produces inconsistencies or other indicia that the event was not precisely as depicted by the witness on direct examination. Such inconsistencies or imperfect recollection can be attributed to a number of causes, including the passage of time or repeated recounting of the event. However, one's character for honesty and truthfulness is a pervasive trait and spans events beyond the case on trial.

A review of the record discloses that Miller's cross-examination of Luck was structured to secure statements that admitted or implied that Luck's injuries were the result of a 1985 accident at a 7–Eleven store; that, in a previous suit, Luck withheld information from attorneys regarding her treating physicians and regarding the subsequent accident with Miller; and that Luck misrepresented the permanency of, and pain arising from, her injuries sustained in the previous accident. These matters are ones about which she could not have been "honestly mistaken," go beyond the events of this case, and bring into question the character of Luck as to the trait of veracity.

[*Id.* at 871 (citations omitted).]

The defense in this case was that plaintiff is a malingerer and that the cognitive deficits from which he claims to suffer as a result of the 1997 accident are a fraud. To establish that plaintiff's claim that his capacity to play the saxophone and march in the Avalon String Band had been seriously impaired was fraudulent, defendants introduced extensive surveillance videotapes of plaintiff engaging in this activity after the accident. To prove that plaintiff's claim that he can no longer drive a car is a lie, defendant introduced a videotape which showed him getting into the driver's side of a car. In addition, defendants presented three medical experts who testified that the answers plaintiff gave during psychological testing were not credible and that in their opinions he was faking his symptoms of a serious brain injury. One of them, Dr. Joseph Zielinski, testified:

Based upon the interview behavior and the results of the testing the overall data is simply not credible. I could not believe it as being an accurate representation of what is going on with Mr. Ostrowski. *It really looks like an individual who is deliberately doing poorly and faking the results.*

. . . .

[W]hen he comes to my office and acts like he can't take his coat off or when I read the depositions and hear, read that he can't go anywhere without his wife, or when I see him leave his home by himself and get into the driver's side of his truck, *when I see all these things it looks to me like he's not credible, like he's not telling the truth about what he can and can't do.*

(Emphasis added).

Thus, defendants introduced evidence to show that plaintiff not only had lied in his deposition and trial testimony but had been fraudulently posing as a cognitively impaired person during the entire four and a half year period between his accident and the trial of this case: that he had fraudulently presented himself as cognitively impaired to his former employer, co-workers and close friends; that he had pretended to other members of the Avalon String Band, who had been his colleagues for more than fifteen years, that he was no longer capable of playing a saxophone and marching at a sufficiently high level to perform at the front of the band; and that he had concocted responses to questions posed to him during extensive psychological questioning that led experienced psychiatric experts to conclude that he was suffering from serious cognitive deficits. In short, defendants claimed that plaintiff had been living a lie ever since the accident in order to obtain a substantial recovery in this lawsuit.

Furthermore, defendants did not limit this portrayal of plaintiff to the period after the accident. They also implied that plaintiff had fraudulently obtained a substantial recovery in a prior lawsuit arising out of a 1989 accident. One of defendants' medical experts, Dr. Rieger, was allowed to give the following testimony:

> There is a body of literature in psychiatry indicating that once you've been successful in a litigation you tend to go back for more, in plain English. There is a so-called learning curve. And his, Mr. Ostrowski's learning curve is rather steep, exponential. And so that's *I think the crux of this matter is that he has been rewarded before for, in my opinion, exaggerating claims and he is trying to go that route again.* He's pursuing what we call secondary gains.... Secondary gains is a concept that goes back in psychiatry all the way to Freud who found at a time when there were no lawyers involved and no money involved that people got so-called secondary gains out of their neuroses, out of their mental illness, namely now when they had such and such symptom they got more consideration by their loved ones. It's all right, honey, I'll do the chores, or it's all right, honey I won't make any sexual demands on you, et cetera, et cetera. They also got ... attention from professionals, be they doctors and later on in the last century it developed that lawyers also got involved.
>
> ... And in addition to the most important money aspect, the expression of old anger through the socially acceptable channel of litigation can be seen as secondary gain. So we have multiple secondary gains that he has pursued as a result of the

'89 accident and again today.[2]
  (Emphasis added).

The clear implication of Dr. Rieger's testimony was that plaintiff had "exaggerated" the claim he made following his 1989 accident and that plaintiff's malingering regarding the effects of his 1997 accident constituted a repetition of a pattern of fraudulent conduct he had successfully engaged in before.

*N.J.R.E.* 608 provides that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." We are satisfied that the opinion of defendants' medical experts that plaintiff was faking his symptoms of a serious brain injury was "opinion evidence" attacking plaintiff's character for truthfulness, which plaintiff was entitled to rebut by opinion and reputation evidence attesting to his character for truthfulness. This makes it unnecessary for us to decide whether any of the other evidence defendants presented to impeach plaintiff's trial testimony, such as the prior inconsistent statements in his deposition, would have provided a sufficient foundation for the introduction of evidence of his character for truthfulness.

■ We also reject defendants' further argument that the trial court committed reversible error in allowing plaintiff to present evidence of his character for truthfulness during his case in chief, rather than requiring him to withhold such evidence until rebuttal. *N.J.R.E.* 608 states that evidence of truthful character is admissible only "after" the character of the witness for truthfulness has been attacked. However, *N.J.R.E.* 608 does not state that the only way a party may attack the character for truthfulness of another party's witness is by the presentation of evidence in that party's case or that evidence of a witness's truthful character may be presented only in rebuttal. Consequently, the courts in a number of jurisdictions have recognized that a witness's character for truthfulness may be raised as an issue in an opening state-

---

[2] We express no opinion concerning the admissibility of this type of testimony.

ment, thus permitting the other party to present evidence on the issue in its case in chief. *See, e.g., Renda v. King,* 347 *F.*3d 550, 555–56 (3d Cir.2003); *United States v. Monroe,* 943 *F.*2d 1007, 1013–14 (9th Cir.), *cert. denied,* 503 *U.S.* 971, 112 *S.Ct.* 1585, 118 *L.Ed.*2d 304 (1992); *United States v. Jones,* 763 *F.*2d 518, 522 (2d Cir.), *cert. denied,* 474 *U.S.* 981, 106 *S.Ct.* 386, 88 *L.Ed.*2d 339 (1985); *State v. Eugenio,* 219 *Wis.*2d 391, 579 *N.W.*2d 642, 647–48 (1998). In this case, defense counsel's basic theme in his opening statement was that plaintiff's claim was fraudulent, and he outlined the expert testimony he intended to present to establish this contention. We are satisfied that this opening constituted an attack on plaintiff's character for truthfulness that warranted plaintiff presenting evidence concerning this character trait during his case in chief.

This conclusion is supported by practical considerations. If plaintiff had been required to withhold the presentation of evidence of his character for truthfulness until rebuttal, he would have been forced to recall each one of the treating doctors and lay witnesses who testified in his case in chief. Such a procedure undoubtedly would have seriously inconvenienced many of those witnesses and plaintiff may have been unable in some instances to secure their attendance in court for a second time. Therefore, in view of the fact that defense counsel's opening statement left no doubt that plaintiff's character for truthfulness would be aggressively attacked, the trial court did not abuse its discretion in allowing plaintiff to present evidence of his character for truthfulness in his case in chief.

## II

At the argument on defendants' motion to bar plaintiff from presenting evidence of his character for truthfulness, there also was colloquy concerning plaintiff's presentation of evidence regarding other traits of his character. At that time, defense counsel stated: "I have no problem with talking about his physical capability before, his—his work habits before and after, ... I'm

not saying that they can't talk about his work capabilities, physical capability as they observed it before and after the accident." However, defense counsel expressed concern that plaintiff also would attempt to present evidence that he was a "wonderful person" or contributed to charitable works. The trial court ruled that "he's not going to be allowed to testify that he gives to charity."

Consistent with defendants' pretrial concession, plaintiff presented testimony by various witnesses that plaintiff had been "hardworking" and "industrious" before the 1997 accident. In addition, contrary to the trial court's pretrial ruling, plaintiff presented testimony by two witnesses concerning volunteer work plaintiff had performed for charities. On appeal, defendants argue that neither type of character evidence was admissible, and that the trial court committed reversible error in allowing such testimony. The admissibility of these two types of character evidence requires separate analysis.

*N.J.R.E.* 404(c) provides: "Evidence of a person's character or trait of character is admissible when that character or trait is an element of a claim or defense." Where a plaintiff in a personal injury case asserts a claim for lost earnings, his or her earning capacity, which may be affected by how industrious and hardworking he or she had been before the accident, is relevant to the claim. *See Wimberly v. City of Paterson,* 75 *N.J.Super.* 584, 611, 183 *A.*2d 691, 705 (App.Div.), *certif. denied,* 38 *N.J.* 340, 184 *A.*2d 652 (1962). A plaintiff's industriousness also may be relevant in determining the value of their loss of opportunity to enjoy other activities, such as playing in a band or performing community service, *see Ocasio v. Amtrak,* 299 *N.J.Super.* 139, 157, 690 *A.*2d 682, 691 (App.Div.1997), as well as a spouse's loss of consortium claim. Therefore, defendants properly conceded before trial that such evidence would be admissible, and their contrary argument on appeal is without merit.

Two witnesses testified concerning plaintiff's participation in charitable activities before the accident. Edward Brinkman Jr.

testified that plaintiff organized a memorial scholarship fund in his son's name for the local high school. Plaintiff obtained three bands, two DJs and various local celebrities to perform musical numbers at a fundraiser and also persuaded local businesses to contribute food and other merchandise for the occasion. At the conclusion of this testimony, the trial court gave the jury a limiting instruction:

> The jury is cautioned about the last testimony. The purpose of the testimony should not use the evidence that he had a scholarship fund for the purpose of determining whether he's a nice guy or not, because that doesn't matter in the case. The purpose of the testimony that you can consider it for is whether he had organizational skills and ability to do things prior to the injury that he doesn't have after the injury. You can consider the testimony as to whether it proves that or not. It's up to you how you accept the evidence or whether you believe the evidence, but that's what it's—the purpose of the evidence, and you should only use it for that purpose.

The other witness who testified about plaintiff's participation in a charitable activity was Janet Walters, the principal at the parochial school attended by plaintiff's children. Walters testified that plaintiff had volunteered to put up wallpaper on the school chapel and that, in her opinion, both plaintiff and his wife are truthful persons. Defendants did not object to this testimony, and the trial court did not give the jury any limiting instruction.

In our view, the trial court should have excluded Brinkman's and Walter's testimony, at least if timely objection had been made, on the ground that its probative value was substantially out-weighed by its prejudicial impact, see *N.J.R.E.* 403, particularly in view of the fact that plaintiff had already presented substantial other testimony concerning plaintiff's organizational skills before the accident and his truthful character, which were the ostensible subjects of these witnesses' testimony.

■ However, we do not believe that Brinkman's and Walter's testimony was sufficiently prejudicial to require a new trial. This testimony consumed at most fifteen minutes during the course of an eighteen day trial in which the jury heard numerous witnesses testify about plaintiff's character. Both plaintiff and his treating doctors were forced to admit that he had not originally told them

about the 1989 accident, and plaintiff was confronted with his false deposition testimony that he had not resumed playing in the string band after the 1997 accident. Plaintiff countered this evidence and the testimony of defendants' medical experts that he is a malingerer by presenting substantial evidence of his character for truthfulness, and based on all this evidence, the jury concluded that plaintiff had suffered a serious brain injury in the accident. In view of the voluminous trial record focusing on plaintiff's character for truthfulness, we are unable to conclude that the brief testimony concerning two charitable activities plaintiff engaged in before the accident had a sufficient prejudicial impact upon the jury to require a new trial.

Affirmed.