UNITED STATES of America,
Plaintiff-Appellee,

v.

MEDICAL THERAPY SCIENCES, INC.,
and Stanley Berman,
Defendants-Appellants.

No. 927, Docket 78–1049.

United States Court of Appeals,
Second Circuit.

Argued May 2, 1978.

Decided Aug. 2, 1978.

George E. Wilson, Asst. U. S. Atty. S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Malcolm S. Taub, New York City (Norman J. Mordkofsky, New York City, of counsel), for defendants-appellants.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

MOORE, Circuit Judge:

After a jury trial, appellants Stanley Berman and his company, Medical Therapy Sciences, Inc. ("Medical Therapy"), were convicted of having filed false claims to obtain Medicare payments during the period of 1971–1976, and of having conspired to do the same along with unindicted co-conspirators, including one Barbara Russell, formerly a trusted employee and personal intimate of Berman. Berman was also convicted of perjury in connection with the grand jury's investigation of Medicare abuses.

The proof of Berman's fraud can be briefly stated. Berman's medical equipment supply company, Medical Therapy, was a Connecticut company, which had a branch, Respiratory Specialties, that operated out of New York. Under the Medicare program, Medical Therapy was to be reimbursed, ultimately by the Department of Health, Education and Welfare, for a certain percentage of the cost of supplies to Medicare patients. However, reimbursable costs vary from one insurance carrier to another, and the place from which the service is rendered determines which carrier is to pay, and which carrier's payment schedule is to apply. Under the rules, if Berman's Connecticut company supplied equipment to a Connecticut Medicare patient, the claim should have been submitted to the Connecticut insurance carrier, not to the New York carrier. At trial, Berman was shown to have devised a scheme to wrongfully obtain payments from both the Connecticut and New York carriers. Aside from double billing the two companies for the same patients, Berman's fraud also consisted of claiming for more expensive equipment than had actually been provided to patients and billing for supplies neither delivered nor needed by the patients.

On appeal, Berman claims error with respect to the conspiracy and perjury counts, and he argues that the trial court erred in permitting the Government to present character evidence in its rebuttal case to support Barbara Russell's credibility.

### I.

■ With respect to the perjury count, though Berman admits having been informed that he was the "target" of the grand jury investigation, he argues that the Assistant United States Attorney who conducted the proceedings failed to sufficiently inform him of the substantive nature of the inquiry. This argument borders on the frivolous. Berman was informed that the investigation involved possible abuse of the Medicare program, and that he could consult with an attorney outside of the grand jury room if he had any questions. We do not believe him so unsophisticated that he was misled in any way by the Assistant's failure to discuss each statutory provision being considered by the grand jury, as Berman seems to claim the Assistant should have done. Berman's perjury count is in all respects proper.

### II.

■ As to the conspiracy, Berman's claim is that there was insufficient evidence to support the conviction on that count. He contends that no "agreement" was proved—that both Russell and the other alleged co-conspirator, another employee of Medical Therapy who also testified against Berman, testified only that they had knowingly submitted false claims after having been "directed" by Berman to commit those acts which were alleged to have been a part of the conspiracy. We think that the question was properly before the jury, which fairly inferred the existence of an agreement between Russell and Berman. The law does not require proof of a formal agreement, and the proof in this case of conversations regarding, *inter alia*, billing practices and insurance rules provided ample circumstantial evidence from which an agreement could have been found. Both Berman and Russell, who supervised much of the billing, had been briefed as to Medicare policy and the insurance carriers' rates, rules, and regulations. Russell's testimony provided evidence that she and Berman had discussed the rules and the "questionable" practices on many occasions. Both knew that the result of their independent practices would be to obtain Medicare funds that, under the rules, should not have been forthcoming. Giving due weight to the jury's right to evaluate the evidence before them, the jury was entitled to infer from the actions of Russell and Berman that the two shared an understanding to defraud the Medicare system. *See, e. g., United States v. Tyminski*, 418 F.2d 1060, 1062 (2d Cir. 1969), *cert. denied*, 397 U.S. 1075, 90 S.Ct. 1523, 25 L.Ed.2d 810 (1970).

### III.

Berman does not challenge the sufficiency of the evidence as to the substantive counts. Rather, his final claim is that his

convictions should be reversed because error was committed when, over defense objection, the trial judge permitted the Government to present character witnesses to bolster Russell's credibility. Berman claims that a new trial is required in view of the fact that Russell's credibility was crucial under the defense theory of the case—*i. e.,* that it was Russell alone who had perpetrated the frauds.

Rule 608(a)[1] of the Federal Rules of Evidence provides that character evidence may be used to support a witness, but limits its use so that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." Berman's claim is that the foundation for character evidence was not present in this case because Russell's character for truthfulness had not been attacked within the meaning of the Rule. He argues that cross examination elicited only matters of Russell's bias in favor of the Government and against Berman and that, in any event, the Government itself initially brought to the jury's attention, on its direct examination of Russell, the facts that she had had two prior convictions and that she had been accused by Berman of having embezzled money from Medical Therapy. Berman contends that the Government should not thereafter have been allowed to bolster her credibility when the defense cross examined only as to matters brought out on direct.

The Government's argument is that, in questioning Russell on direct as to her prior convictions, the prosecutor was only anticipating defense impeachment, as it had the right to do, so that the jury would not gain the impression that the Government was attempting to hide information from them. *United States v. Stassi,* 544 F.2d 579, 583 (2d Cir. 1976), *cert. denied,* 430 U.S. 907, 97

S.Ct. 1176, 51 L.Ed.2d 582 (1977); *United States v. Rothman,* 463 F.2d 488, 490 (2d Cir.), *cert. denied,* 409 U.S. 956, 93 S.Ct. 291, 34 L.Ed.2d 231 (1972). Because Russell's truthfulness was "attacked" on cross examination, the Government argues that Rule 608(a) by its terms permits it the use of character evidence, notwithstanding its own elicitation of Russell's background.[2] Although the issue is a close one, we believe that the decision to permit the evidence in question was one within the trial judge's discretion.

■ As to the point that the Government first elicited the impeaching facts, we agree that the Government had the right to proceed as it did. Rule 608 itself contains no limitation that precludes a party from offering character evidence under circumstances where it anticipates impeachment; rather, the event that triggers the applicability of the Rule is an "attack" on the witness' veracity. While under the Federal Rules, a party *may* impeach his own witness, Fed.R.Evid. 607, there is a vast difference between putting that witness' veracity in issue by eliciting the impeaching facts and merely revealing the witness' background. Indeed, even in jurisdictions where a party may not discredit his own witness, it has been held that the fact of prior convictions may be brought out on direct examination for non-impeachment purposes. As stated by the New York Court of Appeals,

"The law does not limit a party to witnesses of good character, nor does it compel a party to conceal the bad record of his witnesses from the jury, to have it afterwards revealed by the opposing party with telling effect. Such a rule would be unfair alike to the party calling the witness and the jury. . . . [W]hen a disreputable witness is called and frankly

---

1. In full, Rule 608(a) provides:

"The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

2. The Government also argues that Berman waived any objection on the ground that the Government had been the first to elicit the "impeachment facts" from its own witness. While it is true that this precise point was not raised below, *see* Tr. 1760–73, defense counsel did interpose an objection to the character witnesses pursuant to Rule 608(a), and we think that the issue is properly before us.

presented to the jury as such, the party calling him represents him for the occasion and the purposes of the trial as worthy of belief." *People v. Minsky*, 227 N.Y. 94, 98, 124 N.E. 126, 127 (1919). *See also* Richardson, *Evidence*, § 509 (Prince 10th ed.).

■ While we do not think that Rule 608(a) should make supporting character evidence available to a party who elicits impeachment material on direct examination for impeaching purposes, we do believe that, when the tenor of the direct examination does not suggest an "attack" on veracity, and when cross examination *can* be characterized as such an attack, the trial judge should retain the discretion to permit the use of character witnesses. His proximity to the situation allows him to make the determination of when, and by whom, an attack is made. Were the rule to be otherwise, a party would have to choose between revealing, on direct, the background of a witness and its right to use character evidence if the witness' veracity is subsequently impugned.

■ In the instant case, the Government's direct questioning of Russell was brief and to the point. She was simply asked whether, when she left Medical Therapy to establish a business which was in competition with Berman's, she had taken patients from Berman's operation; she answered in the negative. This questioning covered about one page. (*See*, Tr. 1003). The prosecutor also elicited the fact that, near the end of Russell's employment with Berman, at a time when relations between the two were strained, Berman had accused Russell of taking $70 from him, and that she had denied the charge (claiming, in fact,

that Berman had owed her and her husband for past loans), but had repaid the money to avoid any further problem. (Tr. 1015). Finally, she admitted her two prior convictions for obtaining amphetamines by fraudulent practices, but explained that she had committed the acts at a time when she had been addicted to the drug for weight control purposes and that she had sought help after her second conviction. Even this interchange covered only five pages of transcript. (Tr. 1016–1020). At least on the basis of the cold record before us, it appears that, in a very real sense, the Government did not put Russell's veracity in issue. Thus, though we believe that the trial judge should retain discretion to disallow the use of character evidence under circumstances such as this, we think he must also be permitted to allow it when, subsequent to the revelation of a witness' problems on direct, the opponent paints the witness with more accusatory strokes—especially where, as here, wrongdoing which implicates veracity is alleged and denied.

In this case, however, Berman argues that his counsel did not open the door to character evidence because his cross examination of Russell did not constitute an "attack on veracity". We conclude, however, that Judge Carter could have properly characterized the defense's treatment of Russell as an attack within the meaning of Rule 608(a).

In this case, cross examination of Russell included sharp questioning about her prior convictions, which were predicated on activities characterized as fraudulent. When such convictions are used for impeachment purposes, as they were on cross examination here, we think that the door is opened to evidence in support of truthfulness.[3] *See* 3

---

**3.** Indeed, under Rule 609(a)(2), a witness may always be impeached by proof of a prior conviction if the crime involved "dishonesty or false statement". In defining that phrase, the Conference Report on the Federal Rules stated that

"the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthful-

ness or falsification bearing on the accused's propensity to testify truthfully."
H.R.Rep.No.93–1597, 93d Cong., 2d Sess. 9 (1974), U.S.Code Cong. & Admin.News 1974, at p. 7103. *See also United States v. Dixon*, 547 F.2d 1079, 1082–83 (9th Cir. 1976); 3 Weinstein & Berger, *Evidence* ¶ 608[05], at 608–28 (and authorities therein cited), and ¶ 608[08].

Since the attack on Russell was predicated in part on convictions for fraud, which are deemed to have a bearing on a witness' truthfulness, supporting character evidence would

Weinstein & Berger, *Evidence* ¶ 608[08], at 608–41 (1977); Advisory Committee Note to Rule 608(a); McCormick, *Evidence* ¶ 49; 4 Wigmore, *Evidence* §§ 1106–1107.

■ Russell's character was also attacked by "specific act" evidence, to wit, allegations that she had embezzled money and stolen patients from Berman's company. While Berman argues that such evidence, because it involved her efforts to set up a competing business, bore solely on her bias against him, and, as such, did not constitute an attack on character, *see* Weinstein & Berger, *supra*, at 608–42; 4 Wigmore, *supra*, § 1107, we do not think that the implications were so limited. As noted by the commentators, evidence of bias can take many forms. *See* McCormick, *Evidence* § 40. Some types of bias, for example bias stemming from a relationship with a party, do not necessarily involve any issue relating to the moral character of the witness, but suggest only that the witness' testimony

may perhaps unwittingly be slanted for reasons unrelated to general propensity for untruthfulness. As such, character evidence is not relevant to meet such an attack. On the other hand, alleged partiality based on hostility or self-interest may assume greater significance if it is sought to be proven by conduct rising to the level of corruption. The commentators agree that "[e]vidence of corrupt conduct on the part of a witness should be regarded as an attack on his truthfulness warranting supportive evidence . . . ."[4] 3 Weinstein & Berger, *supra*, at 608–42, *citing* McCormick, *Evidence* § 49, at 107 (1954). Certainly, the embezzlement and theft of which Russell was accused can be said to fall within the category of corrupt conduct, within the contemplation of Rule 608(a).[5] *See* Weinstein & Berger, *supra*, ¶ 608[05] and authorities therein discussed. Furthermore, Russell consistently denied the larceny that was ascribed to her by the defense attack.[6] Under such a circumstance, the

---

be relevant under Rule 608(a) to meet the impeachment.

4. Here, Berman did attempt to prove Russell's embezzlement by extrinsic evidence—*i. e.,* the testimony of defense witness Spyek (Tr. 1602). Further, defense witness Menti testified that Russell had suggested that he "steal" from Medical Therapy (Tr. 1378) to supply her competing business with equipment, contrary to Russell's denials; he also testified that he had seen Medical Therapy equipment at Russell's company (Tr. 1379–80).

While this evidence may have suggested bias, and while it was admissible pursuant to the defense theory that Russell had falsified claims in order to obtain money for her own purposes, it also served to attack Russell's veracity in a severe manner by suggesting that she had lied when she denied the embezzlement and theft.

5. Embezzlement convictions are treated by the Conference Report as relevant to truthfulness. *See* n.3 *supra*. If embezzlement is alleged, but it never was the subject of a conviction, logically the accusation does not lose its character as an attack on truthfulness. *Accord,* Weinstein & Berger, *supra*, ¶ 608[05].

6. *See* n.4 *supra*, to the effect that the defense attack here went far beyond mere accusation by cross-examination and denial. Other witnesses were called to contradict Russell's denials in order to support the defense's theory that Russell had the motive to commit the frauds, on her own, and for her own purposes—that

she could have submitted false claims to cover up for her embezzlement. Though contradiction cannot usually be characterized as an "attack" on character, Weinstein & Berger, *supra*, ¶ 608[08], at 608–43, *citing* McCormick, *Evidence* § 49, here the contradiction specifically implicated Russell's veracity.

As Judge Weinstein and Professor Berger suggest,

"the mandate in Rule 401 to admit all relevant evidence should be construed to authorize—but not to require—the admission of supportive character evidence if the trial judge finds in the circumstances of the particular case that the contradiction amounted to an attack on veracity." ¶ 608[08], at 608–43.

This suggestion, in essence, is the conclusion we adopt today. *Accord,* Advisory Committee Note to Rule 608. We think that trial judges should be permitted, under Rule 608, to exercise sound discretion to permit or deny a party the use of character evidence to support veracity. As is always the case, the balancing test under Rule 403 must be considered before any such evidence is permitted over objection. Furthermore, it is always open to the trial judge to deny a party the opportunity to present only cumulative evidence bearing solely on credibility. *See United States v. Augello*, 452 F.2d 1135, 1140 (2d Cir. 1971) (character evidence should be used with great circumspection, and may be disallowed), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122; 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972).

commentators again agree that "rehabilitating evidence should be allowed in the judge's discretion if he finds the witness' denial has not erased the jury's doubts". Weinstein & Berger, *supra*, at 608-41—42, citing the agreement of Wigmore and McCormick on this point.

We think, in sum, that the decision to permit the character evidence must be affirmed on the facts. We emphasize, however, that discretion in this area must be exercised with circumspection so that the jury's attention is not diverted from the main issues to be tried. It is not every cross examination that should trigger the authority of Rule 608(a)'s provision for supporting character evidence. However, since the attack in this case went even beyond cross examination, and since Berman's guilt was established not only by Russell's testimony, but also by ample supporting evidence, both documentary and in the form of testimony from the Blue Cross specialist and from other employees of Medical Therapy, we affirm.

Judgment affirmed.