NOTICE: NOT FOR PUBLICATION.
UNDER ARIZ. R. SUP. CT. 111(c), THIS DECISION DOES NOT CREATE LEGAL PRECEDENT
AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*

*v.*

JORGE CARLOS CENTENO-SARABIA, *Appellant*

No. 1 CA-CR 11-0803

FILED 12-11-2014

Appeal from the Superior Court in Maricopa County
No. CR2008-147702-001
The Honorable Sherry K. Stephens, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

DeBrigida Law Offices PLLC, Glendale
By Ronald M. DeBrigida, Jr.
*Counsel for Appellant*

Jorge Carlos Centeno-Sarabia, Florence
*Appellant*

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court. Presiding Judge Samuel A. Thumma specially concurred in part and concurred in the judgment. Judge Michael J. Brown specially concurred in part and dissented in part.

**J O H N S E N,** Judge:

**¶1** Jorge Carlos Centeno-Sarabia ("Defendant") appeals his convictions and sentences for one count of sexual abuse and two counts of sexual conduct with a minor. Counsel for Defendant filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), advising that after searching the record on appeal, he was unable to find any arguable grounds for reversal. Defendant was granted the opportunity to file a supplemental brief *in propria persona*, and has done so. Our obligation is to review the entire record for reversible error. *State v. Clark*, 196 Ariz. 530, 537, ¶ 30, 2 P.3d 89, 96 (App. 1999).

**BACKGROUND**[1]

**¶2** The State charged Defendant with one count (Count 1) of sexual abuse, a Class 3 felony, in violation of Arizona Revised Statutes ("A.R.S.") section 13-1404(A) (2014) for intentionally or knowingly touching the victim's breasts, and two counts (Counts 2 and 3) of sexual conduct with a minor, Class 2 felonies, one involving digital-vaginal penetration and the other involving penile-vaginal penetration, in violation of A.R.S. § 13-1405(A) (2014).[2]

**¶3** The victim, age 13 at the time, was playing at her apartment complex with two boys when the victim told one of the boys "a story." One

---

[1] We view the facts in the light most favorable to sustaining the convictions and resolve all reasonable inferences against Defendant. *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).

[2] Absent material revision after the date of the alleged offense, we cite a statute's current version.

of the boys accompanied the victim to his apartment, and informed his mother, N.H., that the victim had a story she needed to tell. The victim then told N.H. that a neighbor had invited her over to his apartment and "hurt her down there" in her "private parts."

¶4        Officer Gary Hodgekiss was dispatched to the apartment complex. The manager directed Hodgekiss to an apartment rented by L.C., a woman Hodgekiss had known for several years; she worked at a nearby grocery store where he worked off-duty as a security guard. Hodgekiss also was acquainted with L.C.'s daughter, the victim, and he was aware that the victim had developmental delays, but she was capable of doing her homework and understanding basic conversation.

¶5        When Hodgekiss started walking toward L.C.'s apartment, L.C., the victim and the Defendant all were present – standing within an arm's length of each other. L.C. then informed Hodgekiss that her next-door neighbor had molested her daughter. When Hodgekiss went to talk to the victim, he noted that she was animated, bouncing sporadically on the living room sofa. When Hodgekiss asked the victim what happened, she indicated that "the man next door pinched me real hard, right here," while pointing to her pelvic area. She then followed that statement by "blurt[ing] out" that the man had "kissed [her] titties."[3]

¶6        Hodgekiss walked past Defendant's apartment, where he observed Defendant standing in the doorway. As Hodgekiss walked past, Defendant spontaneously told him that the victim had never gone past the threshold of his apartment. When Hodgekiss returned to the victim's apartment to speak with her a second time, the victim became very agitated and pointed to Defendant, who was standing outside, yelling out that he was the individual who abused her.

---

[3]        The victim testified at trial that on the day of the incident, Defendant called her into his apartment, told her she was his girlfriend, removed her clothes, "humped" her, and then "wiped" her. She stated that Defendant touched her "butt" with his hand and "hump[ed]" her with his "weenie." (Although the victim repeatedly referred to penetration of her "butt," she clarified that penetration took place where her "pee" comes out.) She also testified that Defendant kissed her breasts. Although the victim initially equivocated in identifying Defendant, she eventually clarified he was the individual who lived in the neighboring apartment who sexually abused her.

¶7         Detective Gregory McKay searched Defendant's apartment. According to McKay, Defendant's apartment appeared to be consistent with the victim's description of what she observed.

¶8         McKay testified that the clothing collected from the victim during the medical exam had been placed in sealed envelopes and stored in the police evidence locker. McKay identified the clothing as what the victim had been wearing the day of the incident. Based on the fit of the clothing, he opined that while the victim was wearing her clothing, it would have been impossible for Defendant's DNA to accidentally transfer onto the victim's chest.

¶9         Dr. Leslie Quinn examined the victim after the incident. Based on the appearance of injuries to the victim's genitals, Quinn testified that the injuries certainly "occurred within 24 hours of" her examination and were consistent with the victim's explanation that a neighbor had sexually abused her.

¶10         Stephanie Novak, a forensic biologist and DNA analyst at the Phoenix Police Department's crime lab, testified that the victim's vaginal swabs revealed the victim's DNA and DNA from an unidentifiable source. Novak was not able to identify the other source because there was insufficient DNA present.

¶11         Vincent Miller, the DNA technical leader at Chromosomal Laboratories in Phoenix, testified that analysis of a swab from Defendant's genitals revealed the presence of DNA that was substantially similar to the victim's, but Miller could not draw any definitive conclusions based on the analysis. However, Miller testified that the DNA collected from the tip of Defendant's penis contained two matching alleles consistent with the victim's DNA profile. Miller then went on to testify that the DNA analysis from the victim's chest area definitively showed the presence of both the victim's and Defendant's DNA.

¶12         Defendant elected to waive his right to counsel and represented himself at trial, with the assistance of court-appointed advisory counsel. In opening statements, the prosecutor explained the relevance of the victim's mental condition as follows:

> Something that you should know about [the victim] is that she has a learning disability. [The victim] is mentally disabled. Now we tell you this not to engender any passion or empathy towards her. Because you should judge [the victim's] testimony just like you would anybody else's. And we expect

you to hold her to the same standards that you would any other witness that testifies. But with that being said, we do ask you to consider the fact that she does have a disability and she's a child. So as you hear that testimony, just keep that in mind, but at the same time hold her to the same standard.

The prosecutor also urged jurors to focus on the evidence that would corroborate the victim's testimony. In his opening statement, Defendant urged jurors to pay attention to the DNA evidence and the testimony of Officer Hodgekiss. Defendant cross-examined witnesses, including the victim, but did not testify on his own behalf.

¶13        The jury found Defendant guilty as charged. The trial court sentenced Defendant to the presumptive terms on each count: 15 years' imprisonment on Count 1 and 30 years' imprisonment on Counts 2 and 3, with each term to be served consecutively. This timely appeal followed.

## DISCUSSION

### I.        Issues Raised in *Penson* Order.

¶14        Following our initial review of the record, we issued an order pursuant to *Penson v. Ohio*, 488 U.S. 75 (1988), directing the parties to file supplemental briefs addressing the following issues:

> 1. Did fundamental error occur when Officer Hodgekiss, on direct examination, gave his opinion regarding the victim's character for truthfulness and stated that the victim was not capable of fabrication?

> 2. If fundamental error occurred, was the error prejudicial? In evaluating prejudice, what is the significance of statements made by the prosecution about the victim's credibility during closing arguments? Did the State present overwhelming evidence in support of each count? In particular, what evidence, other than the victim's statements and testimony, supports the conviction on Count 2 (sexual conduct with a minor based on digital penetration)?

¶15        The testimony that gave rise to our order was that of Hodgekiss, who began his testimony on direct examination by explaining that he was the first responder to the 9-1-1 call and that he knew the victim prior to the date of the incident. Hodgekiss had worked for three years during his off-duty time as a security guard at a grocery store where the

victim's mother was a clerk. Hodgekiss observed the victim "three times a week for hours each time" during his shifts, as the victim would regularly come to her mother's workplace to do homework after school and eat dinner. When Hodgekiss was asked on direct examination whether one can tell if the victim had developmental delays just by looking at her, Hodgekiss stated, "If you are walking up to her and you are just kind of watching her mannerisms, if she's doing something, you could probably tell that there was something there, something amiss." Later, describing Defendant's conduct at the apartment complex during the crime investigation, Hodgekiss testified that Defendant pulled him aside and whispered that he thought the victim was "retarded," and therefore the police should not listen to her. Shortly after this testimony the following exchange occurred between the prosecutor and Hodgekiss:

> Q. Based on your training and your personal experience with [the victim] for three or so years, three days a week, *have you had an opportunity to form an opinion about her sort of character trait for truthfulness*?
>
> A. Oh, yeah.
>
> Q. What . . . is that opinion?
>
> A. [The victim] is a very literal person. *In my opinion she is absolutely not capable of fabricating a story. She in my opinion has no imagination whatsoever.* She learns stuff from school, it's what she sees and what she is told that she knows. She knows, in my opinion, nothing beyond that.
>
> Q. Was [the victim] able to point to the person who she said hurt her that day in July of 2008?
>
> A. Yes.
>
> Q. Was she able to articulate to you at least basically what had happened?
>
> A. Yes.
>
> Q. Was she able to point on her body where it was that she had been touched and hurt?
>
> A. Yes.

> Q. *Based on your experience with [the victim], do you consider her to be a malicious person?*
>
> A. No, absolutely not.
>
> Q. *Would you consider her to be vindictive?*
>
> A. No.

(Emphasis added.)

**¶16** Because Defendant failed to object to this testimony, we review it for fundamental error only. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005). To prevail under this standard, Defendant must establish that (1) an error occurred; (2) the error was fundamental in nature; and (3) the error caused him prejudice. *Id.* at ¶ 20.

**¶17** We conclude the Hodgekiss testimony did not constitute fundamental error requiring reversal of any of Defendant's convictions.

**¶18** Our colleague who dissents as to Count 2 concludes that the testimony was admitted in violation of case authorities forbidding a witness from testifying about the accuracy, reliability or credibility of a particular witness. Under this principle, a witness may not opine about the truth of a statement by another witness. *See State v. Moran*, 151 Ariz. 378, 382, 728 P.2d 248, 252 (1986); *State v. Lindsey*, 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986); *State v. Reimer*, 189 Ariz. 239, 240-41, 941 P.2d 912, 913-14 (App. 1997); *State v. Schroeder*, 167 Ariz. 47, 50-51, 804 P.2d 776, 779-80 (App. 1990). These authorities, however, do not bar testimony about a witness's character for truthfulness or untruthfulness, pursuant to Arizona Rule of Evidence 608. Nor do they preclude testimony about a witness's ability to perceive, remember and recount events. *See Wigley v. Whitten*, 78 Ariz. 88, 90, 276 P.2d 517, 519 (1954) ("Undeniably a lay witness, if he can meet the qualifications prescribed by law, may give his opinion concerning mental competency.").

**¶19** Hodgekiss's testimony falls into the latter of the two categories of permissible comment. Although he was asked about the victim's "character trait for truthfulness," Hodgekiss did not address whether the victim had a "character trait for truthfulness or untruthfulness," as Rule 608(a) permits. Instead of responding with his opinion about the witness's character for truthfulness or untruthfulness pursuant to Rule 608(a), he gave his opinion, based on his experience from watching her and talking with her on many instances prior to the incident

here, about her mental capacity to lie: "[S]he is absolutely not capable of fabricating a story." Although stating that one is "not capable of fabricating a story" may in some circumstances be hyperbole designed to mean that the witness would not ever lie, the circumstances here make plain that Hodgekiss was not testifying that the victim *would not* lie but that she *could not*, because she lacked the imagination to do so.

**¶20** Accordingly, Hodgekiss's testimony was permissible comment on the victim's capacity to accurately recount events, not opinion testimony about her "character trait for truthfulness" that might have implicated Rule 608. *See* 4 Joseph M. McLaughlin et al., *Weinstein's Federal Evidence* § 608.12[3], at 608-22 (2d ed. 2014) (attack on witness's memory or knowledge does not implicate Rule 608); *id.* § 608.13[3][a], at 608-29 (distinguishing testimony "about a witness's *character* for lying" from testimony "about his or her *capacity* for telling the truth"); *id.* § 607.05[1], at 607-46 (distinguishing "*mental* capacity for truth-telling" from "*moral* inducements for truth-telling"); *see also United States v. Awkard*, 597 F.2d 667, 670 (9th Cir. 1979) (witness's ability to recall was relevant to credibility but "had nothing to do with his character"). *Cf. United States v. Drury*, 396 F.3d 1303 (11th Cir. 2005) (Rule 608(a) not implicated by testimony highlighting inconsistencies in witness's testimony because that testimony did not constitute an attack on witness's "reputation for truthfulness"); *United States v. Med. Therapy Scis., Inc.*, 583 F.2d 36, 41 (2d Cir. 1978) (character evidence allowed under Rule 608 to counter evidence "relating to the moral character" of the witness).

## II. Issues Raised Separately by Defendant.[4]

### A. Chain of Custody.

**¶21** In his supplemental brief, Defendant challenges the chain of custody of DNA evidence presented during trial. Defendant does not challenge the foundation for the testimony of any witness, but rather contends that the DNA evidence should have been disregarded by the jury based on alleged deficiencies in the custodial process. Specifically, Defendant argues that a numerical inconsistency in a lab technician's notes suggests evidence was compromised and led to potential contamination. In particular, Defendant points to a notation in Exhibit 48 indicating that the envelope containing Defendant's buccal swabs was labeled as number

---

[4] In addition to the arguments addressed below, Defendant challenges the sufficiency of the evidence. Our review of the record discloses sufficient evidence supporting his convictions.

3712**646**.0001.02A. According to Defendant, the item should have been labeled as number 3712**679**.0001.02A. Vincent Miller clarified this mistake, however, when he testified that the error was simply clerical and the photographs taken upon receipt of the samples confirmed the correct identification numbers and preservation of the chain of custody. Our review of the record supports Miller's conclusion and we have found nothing to suggest there were defects in the procedures followed to preserve the chain of custody of the DNA evidence.

### B. Conflict of Interest.

**¶22** Defendant also argues an impermissible conflict of interest existed because the State allegedly hired Chromosomal Laboratories to testify after Defendant had hired the lab to do DNA testing. To support that contention, Defendant relies on *United States v. Bagley*, 473 U.S. 667, 683-84 (1985), which held that a prosecutor's withholding of evidence indicating that a witness had been offered inducements to testify constituted reversible error. Citing *Bagley*, Defendant argues his conviction should be reversed because the State paid Chromosomal Laboratories for Vincent Miller's testimony.

**¶23** The record does not support Defendant's argument. When Defendant raised this issue to the superior court, he alleged he had a document indicating that the State had paid money to Chromosomal Laboratories for testimony of its employee. In response, the State pointed out that Defendant's original trial counsel had hired the lab to perform DNA testing on the samples that the Phoenix Police Department's lab indicated would be consumed during analysis. Further, the State confirmed that when defense counsel originally hired the lab, the fee included trial testimony. Nothing in the record indicates that the prosecution ever paid Chromosomal Laboratories. Accordingly, *Bagley* is inapplicable here and we find no error relating to the State's decision or ability to call Vincent Miller as a witness.

### C. Defendant's Remaining Arguments.

**¶24** Defendant's four remaining arguments in his supplemental brief were not raised during trial; therefore, we review only for fundamental error. *See Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607.

**¶25** Defendant argues that absent testimony from a physician regarding the victim's mental faculties, the victim was not competent to testify at trial. Defendant has presented no argument on appeal for why the victim would be unable to testify other than his conclusory allegation

that the victim's mental disability somehow rendered her incompetent. Arizona Rule of Evidence 601 states that "[e]very person is competent to be a witness unless these rules or an applicable statute provides otherwise." Defendant cites no rule or statute supporting his broad claim of error. Thus, the superior court did not err in allowing the victim to testify without first conducting a competency hearing. *See State v. Perez*, 109 Ariz. 572, 574, 514 P.2d 493, 495 (1973) (superior court had no duty to *sua sponte* conduct a competency hearing of a witness over the age of ten); *State v. Jones*, 95 Ariz. 230, 233, 388 P.2d 806, 808 (1964) (upholding the admission of testimony from two children that defense counsel claimed were "retarded").

**¶26** Defendant also asserts the jury instructions were improper. He fails, however, to identify any specific instruction he believes was erroneous; instead, he suggests that the jury could not possibly have followed the instructions and found him guilty because there was insufficient evidence to do so. We have independently reviewed the instructions and find no error.

**¶27** Defendant further contends that his sentence was improperly aggravated without expert testimony. Our review of the record indicates that notwithstanding the jury's finding of an aggravating factor, the superior court imposed presumptive terms of imprisonment on all counts. Thus, any argument related to the necessity of expert testimony at the aggravation stage is moot. *See State v. Canaday*, 117 Ariz. 572, 575-77, 574 P.2d 60, 63-65 (App. 1977).

**¶28** Finally, Defendant claims that many of the State's witnesses lied under oath. It is well settled, however, that "[a]bsent a showing that the prosecution was aware of any false testimony, the credibility of witnesses is for the jury to determine." *State v. Rivera*, 210 Ariz. 188, 194, ¶ 28, 109 P.3d 83, 89 (2005). If, as Defendant alleges, false testimony was provided, Defendant has made no showing that the prosecution was aware of it.

## III.        Review of Record.

**¶29** As for the remainder of the record, all proceedings were conducted in accordance with the Arizona Rules of Criminal Procedure. The record shows Defendant knowingly and voluntarily waived his right to counsel and was appointed advisory counsel. Defendant was present at all pertinent stages of the proceedings, was afforded the opportunity to speak before sentencing, and the sentences imposed were within statutory limits.

**CONCLUSION**

¶30            For the reasons stated above, we affirm Defendant's convictions and the resulting sentences.

¶31            Upon the filing of this decision, counsel shall inform Defendant of the status of the appeal and his options.  Defense counsel has no further obligations unless, upon review, counsel finds an issue appropriate for submission to the Arizona Supreme Court by petition for review.  *See State v. Shattuck*, 140 Ariz. 582, 584-85, 684 P.2d 154, 156-57 (1984).  Defendant shall have 30 days from the date of this decision to proceed, if he so desires, with a *pro per* motion for reconsideration or petition for review.

**T H U M M A,** Judge, specially concurring in part and concurring in judgment:

¶32            I agree with the thoughtful analysis of the lead decision and its conclusions, with the exception of certain aspects of Part I.  Although not neatly fitting into any specific evidentiary classification, as quoted in paragraph 15 of the lead decision, Hodgekiss appears to have provided testimony about the victim's "character for truthfulness" under Rule 608 in his nonresponsive answer to the question "What . . . is that opinion?"  In doing so as the State's first witness on direct examination, his testimony ran afoul of the requirement that "evidence of truthful character is admissible only *after* the witness's character for truthfulness has been attacked."  Ariz. R. Evid. 608(a) (emphasis added).  Accordingly, had a timely objection and motion to strike been made, the superior court properly could have sustained the objection, granted the motion and stricken the response.  That conclusion, however, does not end the inquiry.

¶33            The victim later testified at trial, and on cross-examination, Defendant sought to impeach her with purportedly inconsistent statements.  Following such testimony by the victim and attempted impeachment by Defendant, case law indicates that evidence regarding the victim's character for truthfulness under Rule 608 would have been proper. *See State v. Byrd*, 160 Ariz. 282, 283, 772 P.2d 1135, 1136 (App. 1988) ("The impeachment of the victim by inconsistent statements put her truthfulness in issue. *Blankinship v. Duarte*, 137 Ariz. 217, 669 P.2d 994 (App. 1983). The rehabilitation of the victim by the state with character evidence was proper.").  Under this analysis, although the receipt of the testimony by Hodgekiss (the State's first witness) was error, receipt of the same evidence from the same witness after the victim testified would not have been.  As a

result, although erroneous, Defendant has not shown and cannot show that such testimony was fundamental error or that the error resulted in prejudice. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 20, 115 P.3d 601, 607 (2005).

**¶34** For these reasons, I concur in judgment in these aspects of Part I of the lead decision and, in all other respects, I agree with the thoughtful analysis of the lead decision and its conclusions.

**B R O W N**, Judge, specially concurring in part, dissenting in part:

**¶35** For the reasons explained below, I conclude that admission of Hodgekiss's testimony regarding the victim's character for truthfulness constitutes fundamental error. However, because overwhelming evidence exists as to Count One and Count Three, I agree that Defendant's convictions and sentences on those two counts should be affirmed. Because the fundamental error as to Count Two was prejudicial, I would vacate that conviction and sentence and remand for a new trial. As to the resolution of issues raised separately by Defendant, I am in agreement with the lead decision.

### Testimony Regarding Victim's Character for Truthfulness

**¶36** "Opinions of a witness regarding questions of truthfulness and guilt are generally inadmissible for a variety of reasons." *State v. Williams*, 133 Ariz. 220, 227-28, 650 P.2d 1202, 1209-10 (1982). Both our supreme court and this court have applied the corresponding principle that while expert testimony may be permitted to present general behavioral characteristics of crime victims that affect credibility or accuracy of observation, neither experts nor lay witnesses should be allowed to give an opinion concerning the "*accuracy, reliability or credibility* of a particular witness in the case being tried." *See Lindsey*, 149 Ariz. at 475, 720 P.2d at 76 (emphasis added); *see also Moran*, 151 Ariz. at 383, 728 P.2d at 253 (recognizing that "the credibility of a witness and the weight to be given his testimony rests exclusively with the jury") (citation omitted); *Reimer*, 189 Ariz. at 240-41, 941 P.2d at 913-14 (explaining that testimony offered by police officer regarding victim's credibility, whether considered as expert or lay opinion, was not admissible "because Arizona courts have expressly determined that neither expert nor lay witnesses assist the trier of fact to understand the evidence or to determine a fact in issue when they merely opine on the truthfulness of a statement by another witness"); *Schroeder*, 167 Ariz. at 50-51, 804 P.2d at 779-80 (finding that investigating officer's opinion

on the credibility of victim was improper, but affirming because the error was harmless).

¶37 These general principles are consistent with Arizona's Rule of Evidence 404(a), which provides that relevant "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ariz. R. Evid. 404(a). Stated differently, Rule 404(a) generally prohibits using a person's character to prove that they are guilty of the crime alleged. Accordingly, courts have historically been concerned with the introduction of character evidence because "[e]vidence of the general character of a party or witness almost always has some probative value, but in many situations, the probative value is slight and the potential for prejudice large." 1 *McCormick On Evidence* ("*McCormick*") § 186 (Kenneth Broun ed., 7th ed. 2013); *see also* Ariz. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

¶38 This rule, however, is subject to three relatively narrow exceptions, one of which permits "[e]vidence of the character of a witness" as provided in Rule 608. Ariz. R. Evid. 404(a)(3). Rule 608(a), as it read at the time of the trial,[5] controls the admission of testimony related to a witness's character for truthfulness or untruthfulness:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) *evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.*

Ariz. R. Evid. 608(a) (2011) (emphasis added). Thus, under the plain language of the rule, the credibility of a witness may be supported by character or reputation evidence only after an "attack" against the witness has occurred. *See McCormick* § 33 ("[T]he general norm is that the witness's

---

[5] Rule 608 was amended, effective January 1, 2012, to conform to the federal restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. The changes were intended to be stylistic only, and there was no intent to change any result in any ruling on evidence admissibility. *See* Ariz. R. Evid. 608 cmt. to 2012 amend.

proponent may not bolster the witness's credibility before any attempted impeachment. For example, on direct examination it would be improper for the witness's proponent to elicit the witness's own testimony that the witness 'always tells the truth.'"); Roger Park, et al., *The New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation* § 9.1 (West 2014) ("A witness may not be supported with evidence of good character for truthfulness until her character for truthfulness has been attacked by the other party."); *Courtroom Handbook Federal Evidence* ("*Courtroom Handbook*") ch. 5, art. IV, Rule 608 cmt. 6 (West 2014) ("Rule 608(a) stipulates that evidence of a witness's truthful character may not be offered unless an attack has first been made on the witness's veracity. Opposing counsel often object to such evidence as impermissible "bolstering." The more precise, and thus more prudent ground for objection, however, is that such evidence violates Rule 608(a).").

¶39     Hodgekiss's testimony regarding his opinion of the victim's character for truthfulness occurred before the victim's character was attacked as contemplated by Rule 608.[6]  Therefore, even assuming such

---

[6]     The lead decision concludes that Hodgekiss's testimony was a "permissible comment on the victim's capacity to accurately recount events, not opinion testimony about her 'character trait for truthfulness.'" Nothing in the State's briefing advocates such an interpretation; nor is it supported by the record. The prosecutor specifically asked the officer if he had formed an opinion as to the victim's character for "truthfulness." Hodgekiss responded that she was "not capable of fabricating a story" and "[had] no imagination whatsoever." If the prosecutor had left this testimony alone, then perhaps it could be construed as relating only to the victim's mental capacity. But the prosecutor focused on the matter repeatedly during closing arguments, mentioning the victim's inability to fabricate twice and noting at least a dozen times that jurors needed to assess credibility of the witnesses, with particular emphasis on the victim's credibility. Given that degree of emphasis, a reasonable juror would not have found Hodgekiss's opinion was unrelated to the victim's character for truthfulness.

        Moreover, even assuming that Hodgekiss was offering an opinion solely as to the victim's mental capacity, he did not testify as an expert and therefore was not permitted to testify about whether she had the mental capacity to tell a lie. *Cf. Moran*, 151 Ariz. at 381, 728 P.2d at 251 ("Jurors, most of whom are unfamiliar with the behavioral sciences, may benefit from expert testimony" explaining behavior they might otherwise

evidence could be deemed properly admitted under the prohibition set forth in *Lindsey* and *Reimer*, it was improper under Rule 608 for the prosecutor to ask for, and the officer to give, opinion testimony about the victim's character for truthfulness before the victim testified.

**¶40**         Relying on several cases from other jurisdictions, the State asserts that Rule 608 permits testimony supporting a witness's character for truthfulness in a general context so long as it does not relate to a witness's truthfulness on a particular occasion. *See, e.g.*, *State v. Arrington*, 840 P.2d 477, 482 (Kan. 1992); *Adams*, 5 P.3d at 646, ¶ 14; *State v. Rimmasch*, 775 P.2d 388, 392 (Utah 1989); *State v. King*, 248 P.3d 984, 997, ¶ 44 (Utah App. 2010). Unlike the case at bar, each of those cases involved the admissibility of expert testimony. Nothing in the trial record indicates Hodgekiss testified as an expert and even if he did, he would not have been permitted to opine as to the truthfulness or character of the victim. *See ¶ 36, supra*.

**¶41**         More importantly, the State's argument fails to address the threshold requirement under Rule 608 that a witness's character for truthfulness must be attacked before it can be bolstered. Each of the cases cited by the State that permitted bolstering involved situations where the witness's credibility had been attacked before attempted rehabilitation, or bolstering, of the witness. Here, the State acknowledges that the prosecutor "elicited the opinion testimony at issue during direct examination of Officer Hodgekiss, who was its first witness, before [Defendant] explicitly challenged [the victim's] truthfulness." Thus, the State does not dispute there had been no attack when Hodgekiss testified that the victim was incapable of fabrication.[7] Under these circumstances, error occurred.

---

"attribute to inaccuracy or prevarication."); *Adams*, 5 P.3d 642, 647, ¶ 18 (Utah 2000) (explaining that "the ability to assess and evaluate the intellectual capacities of a mentally handicapped individual is not within the knowledge or experience of the average individual" and therefore testimony from expert psychologist regarding victim's mental capacity was helpful to the finder of fact). The lead decision cites no authority supporting the proposition that a police officer investigating a crime may opine as to whether a victim has the mental capacity to accurately recall events.

[7]         The State argues that "[b]ecause the State could have recalled Hodgekiss to render his opinion regarding [victim's] truthfulness after these lines of cross-examination, the premature admission of his opinion testimony was not prejudicial." However, this argument goes to the third

**Fundamental Error**

¶42        Error is fundamental if a defendant shows "that the error complained of goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial." *Henderson*, 210 Ariz. at 568, ¶ 24, 115 P.3d at 608. This inquiry is case-specific and thus Defendant must show the error was fundamental in light of the facts and circumstances of this case. *State v. James*, 231 Ariz. 490, 493, ¶ 13, 297 P.3d 182, 185 (App. 2013).

¶43        A key factor in the State's case against Defendant was the credibility of the victim. The prosecutor alerted the jury to the victim's mental condition at the outset of opening statements and repeatedly urged the jury to consider the victim's credibility and ability to accurately recall specifics of her ordeal with Defendant, including offering the following comments about her inability to fabricate in closing argument:

> We've heard it was July 29th, 2008. [Y]ou heard from [the victim]. This is what the people who knew her best said about her, that she was a 13 year old girl but she functioned in the age of six or seven. She was an innocent girl. She . . . is literal, *not capable of fabricating*. She has no imagination. And what she says is what she knows.
>
> . . . .
>
> Over a three year period, I mean, we're looking at a girl whose got a mental disability whose been described as *somebody who can't fabricate*, I mean, this is a girl who could maintain that type of detail consistently over three years of time and then ultimately come in here and tell you the exact same things she told the officers three years ago[.]

(Emphasis added.)

¶44        Additionally, I am unable to overlook the context of the prosecutor's improper solicitation of character evidence from Hodgekiss, who was the State's first witness, thus bolstering the victim's credibility before she even testified. Hodgekiss was personally acquainted with the victim, assisted her with homework on numerous occasions, and had given her and her mother to a ride in his patrol car several times when he saw

---

prong of fundamental error review—prejudice—not whether any error occurred. *See infra* ¶¶ 46-53.

them walking in the summer heat. His opinion as to the victim's credibility was therefore highly relevant as to whether the jury would believe the victim's testimony. *Cf. State v. Nevarez*, 178 Ariz. 525, 527, 875 P.2d 184, 186 (App. 1993) ("A police officer is not per se 'interested' merely by virtue of his involvement in the criminal investigation, *absent evidence of some personal connection with the participants* or personal stake in the outcome of the case.") (emphasis added).

¶45　　Given this very unique factual and procedural scenario, the admission of Hodgekiss's opinion testimony that the victim is "absolutely not capable of fabricating a story" was fundamental error. Such testimony, considered in the context which it was offered and when combined with the substantial emphasis placed upon it by the prosecutor during closing arguments, improperly bolstered the victim's credibility, whose testimony went to the core of the issues at trial and thus deprived Defendant of a right essential to his defense. *See Lindsey*, 149 Ariz. at 474, 720 P.2d at 75 (finding that testimony from an expert that most people in the expert's field feel that incest victims do not lie was improper opinion testimony and reversible error); *State v. Tucker*, 165 Ariz. 340, 350, 798 P.2d 1349, 1359 (App. 1990) (finding reversible error where expert witness was "allowed to testify as to the believability of the victim in violation of *Lindsey* and *Moran*"); *Reimer*, 189 Ariz. at 242, 941 P.2d at 915 (finding reversible error based on officer's testimony addressing credibility of victim's statements notwithstanding defendant's failure to object at trial); *State v. Perez*, 946 P.2d 724, 733 (Utah App. 1997) (finding reversible error under Utah Rule of Evidence 608, based on the State's bolstering of its witness prior to any attack of the witness's credibility); *cf. Schroeder,* 167 Ariz. at 51, 804 P.2d at 780 (noting the trial court erred in admitting testimony of investigating officer regarding the victim's credibility but finding no reversible error because defense objection was sustained, jury was admonished not to consider either the question or the answer, and no further reference to the victim's credibility occurred throughout the remainder of the trial).

### Prejudice

¶46　　Defendant must also establish that the error was prejudicial. *Henderson*, 210 Ariz. at 568, ¶ 26, 115 P.3d at 608. "Fundamental error review involves a fact-intensive inquiry, and the showing required to establish prejudice therefore differs from case to case." *Id.* (citing *State v. Bible*, 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (1993)).

¶47　　The State argues that because the victim's character for truthfulness was attacked during her cross-examination, Hodgekiss's

statements were not prejudicial because he would have been permitted to make the statements if the State had recalled him after she testified. In other words, the State asserts that the prosecutor could present rehabilitation evidence by asking Hodgekiss for his opinion as a form of "anticipatory bolstering."

¶48     As a threshold matter, the victim's character for truthfulness was not attacked, within the meaning of Rule 608, at any point during the trial. *See* Fed. R. Evid. 608 advisory committee's note to 1972 proposed rules ("Opinion or reputation that the witness is untruthful specifically qualifies as an attack under [Rule 608], and evidence of misconduct, including conviction of crime, and of corruption also fall within this category."); *see also* Ariz. R. Evid. 609 (setting forth the rules for "attacking a witness's character for truthfulness by evidence of a criminal conviction"); *Courtroom Handbook* ch. 5, art. VI, Rule 608 cmt. 7 (West 2014) ("Attacks on truthful character typically take the form of reputation or opinion testimony, inquiry into specific acts, or proof of convictions pursuant to Rule 609. Ordinarily, impeaching a witness through evidence of bias, contradiction or prior inconsistent statements does not constitute an assault on character.").[8]

¶49     Accordingly, courts applying the "bolstering" provision of Rule 608 have done so sparingly when a witness's character for truthfulness has not been called directly into question by either reputation or opinion evidence. *See e.g., U.S. v. Dring,* 930 F.2d 687, 692 (9th Cir. 1991) (upholding denial of rehabilitative testimony when the prosecution did not introduce opinion or reputation testimony attacking the witnesses' general character

---

[8]     As a general rule, an attack on a witness's memory or perception does not justify permitting rehabilitation as to truthfulness. *See United States v. Lindstrom*, 698 F.2d 1154, 1162 n.6 (11th Cir. 1983) (citing J. Weinstein, *Weinstein's Evidence* ¶ 607[4] (1981)) ("The credibility of a witness can always be attacked by showing that his capacity to observe, remember or narrate is impaired. Consequently, the witness' capacity at the time of the event, as well as at the time of trial, are significant. Defects of this nature reflect on mental capacity for truth-telling rather than on moral inducements for truth-telling, and consequently Rule 608 does not apply."); *U.S. v. Danehy,* 680 F.2d 1311, 1314 (11th Cir. 1982) (explaining that prosecution's assertions of inconsistencies and lack of credibility in defendant's testimony did not constitute an attack on his reputation for truthfulness within meaning of Rule 608 and therefore trial court properly denied defendant's request to call witnesses to testify to his reputation for truthfulness).

for truthfulness but merely emphasized inconsistencies between the witnesses' testimony and that of the other witnesses); *U.S. v. Dury,* 344 F.3d 1089, 1108-09 (11th Cir. 2003), *aff'd on remand* 396 F.3d 1303 (explaining that prosecutor's comments regarding inconsistencies and lack of credibility in defendant's testimony did not constitute an "attack" on reputation for truthfulness within the meaning of Rule 608); *U.S. v. Medical Therapy Sciences, Inc.,* 583 F.2d 36, 40 (2d. Cir. 1978) (where evidence as to bias suggests only that witness's testimony may be slanted for reasons unrelated to general propensity for untruthfulness, character evidence is not relevant to meet such attack). Here, Defendant did not present either reputation or opinion evidence directly attacking the victim's credibility within the meaning of Rule 608(a).

¶50 The State points to Defendant's cross-examination of the victim, which occurred after Hodgekiss testified, to demonstrate an "attack" under Rule 608 had occurred. Specifically, the State asserts that the Defendant attacked the victim's credibility by asking her during cross-examination (1) whether she had met with the two prosecutors during trial, whether she considered one of the prosecutors to be her "friend," and what they had told her during this meeting; and (2) whether her brother slept in her apartment, how old her brother was, whether she loved him, and whether he was with the victim the day she got hurt. Defendant therefore insinuated the victim may have been coached by the prosecutors when he asked the victim whether she had met with the two prosecutors before trial and considered one of them her "friend." However, Defendant's brief questioning of the victim did not rise to the level of "corruption," which generally exists only when "there is evidence a witness has attempted to obtain false testimony in the case or has used coercive threats or pressure to cause a witness to testify." 1 Joseph M. Livermore et. al., *Arizona Practice Series: Law of Evidence* § 608:6 (Daniel J. McAuliffe & Shirley J. McAuliffe eds., 4th ed. 2008); *see also State v. Dunlap,* 187 Ariz. 441, 456, 930 P.2d 518, 533 (App. 1996) ("Corruption of a witness is defined as the 'conscious false intent which is inferable from giving or taking a bribe or from expressions of a general unscrupulousness for the case in hand.'") (emphasis omitted). Therefore, I am not persuaded by the State's suggestions that Defendant's coaching insinuation constituted an attack on the victim's character for truthfulness.

¶51 Regarding the State's argument that the Defendant's cross-examination questions also insinuated that the victim's brother was the true culprit, those questions were not an attack on the victim's character for truthfulness. The State has not cited, nor has my research revealed, any authority supporting the proposition that raising the possibility of an

alternative perpetrator alone is sufficient to constitute an attack of the victim's credibility for truthfulness. Instead, Defendant's assertion that the crime was committed by someone else amounts to an attack on the victim's memory or perception, which is not an attack on her character for truthfulness. *See supra* note 6; *cf. State v. Byrd*, 160 Ariz. 282, 283, 772 P.2d 1135, 1136 (App. 1988) (holding that rehabilitation of the victim was proper *after* impeachment involving inconsistent statements of the victim had placed her *truthfulness* in issue).

¶**52**        Furthermore, even assuming Defendant had properly attacked the victim's character for truthfulness, the State cites no persuasive authority supporting the use of "anticipatory bolstering." In *United States v. Bowie*, 892 F.2d 1494, 1499 (10th Cir. 1990), the defendant argued on appeal that testimony pertaining to the "truthfulness" portions of a cooperation agreement during direct examination of a law enforcement officer impermissibly bolstered the credibility of the witnesses who had entered the agreement even though those witnesses had not yet testified. The court began its analysis by noting that an open question existed on whether the Rule 608(a) attack requirement applied to the "'truthfulness' portions of cooperation agreements." *Id.* Because "[m]ost of what might be regarded as credibility bolstering was elicited by defense counsel in cross-examination" the court held "that the error, if there was any, does not warrant reversal." *Id.* Unlike *Bowie*, the present case did not involve a witness testifying pursuant to a cooperation agreement in which the witness specifically agreed to tell the truth. Furthermore, unlike the witnesses in *Bowie*, Hodgekiss's testimony went directly to the truthfulness and credibility of the victim, who was the only eyewitness to the crimes at issue in this case. As such, *Bowie* is inapposite.[9]

¶**53**        Moreover, permitting the practice of anticipatory bolstering runs counter to the plain language and purpose of Rule 608. *See U.S. v. Borello*, 766 F.2d 46, 57–58 (2d Cir. 1985) ("For us to disapprove of the present procedure permitting the bolstering of the witness's testimony and then to declare it harmless error would make our remarks in the previous cases purely 'ceremonial.' The error cannot be deemed harmless."); *Perez,*

---

[9]        The other authorities cited by the State relating to this argument are not persuasive, as none of them involved Rule 608 or are otherwise connected to admission of opinion evidence regarding the credibility of a witness. *See U.S. v. Beckman*, 222 F.3d 512, 523-24 (8th Cir. 2000); *U.S. v. Beatty*, 722 F.2d 1090, 1097 (3rd Cir. 1983); *Bible*, 175 Ariz. at 602, 858 P.2d at 1205; *State v. Bates*, 804 S.W.2d 868, 879 (Tenn. 1991); *and Dickson v. State*, 246 S.W.3d 733, 744 (Tex. Crim. App. 2007).

946 P.2d at 732 (declining to adopt an "anticipatory rebuttal" rule because the express language of Rule 608 "clearly provides that a witness's credibility may not be bolstered before it is attacked[.]").  Allowing a party to introduce character or reputation testimony to bolster the truthfulness of a witness who has not yet testified, such as occurred here, would deprive the opposing party of the right to a fair presentation of the evidence.  I therefore disagree with the State's assertion that Hodgekiss's opinion testimony was not prejudicial based on the theory of anticipatory bolstering.

## Overwhelming Evidence — Counts 1 and 3

**¶54**        The State argues that Defendant cannot show prejudice because overwhelming evidence exists as to all three counts.  When an appellate court determines that fundamental error occurred, absent prejudice, reversal of a defendant's conviction is not required.  *See Henderson*, 210 Ariz. at 568, ¶ 26, 115 P.3d at 608.  As such, a defendant may be unable to establish prejudice when the trial record overwhelmingly establishes the defendant's guilt.  *See State v. Morris*, 215 Ariz. 324, 338, ¶ 61, 160 P.3d 203, 217 (2007); *State v. Fimbres*, 222 Ariz. 293, 304, ¶ 43, 213 P.3d 1020, 1031 (App. 2009).

**¶55**        For Count 1, the State had the burden to prove beyond a reasonable doubt that Defendant intentionally or knowingly (1) engaged in sexual contact (2) with any person who is under fifteen years of age and (3) the sexual contact involved only the female breast.  A.R.S. § 13-1404(A).  It is undisputed that the victim was less than fifteen years old.  Regarding sexual contact, the State corroborated the victim's testimony with Dr. Miller's testimony that he positively identified Defendant as the major contributor to the combination of DNA found in the swab samples that Dr. Quinn took from the victim's breasts less than three hours after the incident and that there existed a probability of one in 13.9 quadrillion that someone other than Defendant deposited this genetic material.  For Count 3, the State had the burden of proving Defendant intentionally or knowingly (1) engaged in sexual intercourse (2) with a person under fifteen years of age.  A.R.S. § 13-1405.[10]  The State presented forensic and physical evidence corroborating the victim's pretrial statements and trial testimony.  Given this overwhelming evidence of guilt, Defendant cannot meet his burden of showing that the error of permitting Hodgekiss to give opinion testimony

---

[10]        Sexual intercourse is defined as "penetration into the penis, vulva or anus by any part of the body or by any object or masturbatory contact with the penis or vulva."  A.R.S. § 13-1401(2).

as to the victim's truthfulness contributed to the jury's verdicts on Counts 1 and 3.

**Evidence Supporting Count 2**

¶56        Count 2 alleged that Defendant penetrated the victim's vagina digitally, in violation of A.R.S. § 13-1405.  In support of its argument that there was overwhelming evidence to uphold the conviction on Count 2, the State directs us to essentially the same evidence it relies on to demonstrate overwhelming evidence for Count 3.  However, none of the evidence supporting Count 3 overwhelmingly proves that digital insertion took place.

¶57        Although blood stains were present in the victim's underwear, and a medical examination of the victim's genitals demonstrated trauma, the testimony surrounding this evidence does not support a finding of overwhelming evidence of both digital and penile penetration.  The only testimony explicitly referencing digital penetration, outside of the victim's statements, was based on Dr. Quinn's general observation.  The State points to Dr. Quinn's testimony that the victim had "blunt force trauma" from "something being [forcibly] inserted into the vagina" and that the possible types of blunt force trauma that caused the tear in the victim's hymen included "somebody put[ting] a finger or an object or a penis into the vaginal tissue[,] into the hymen[.]"  However, the essence of Dr. Quinn's testimony was that something penetrated the victim's vagina, causing a tear in the hymen.  Dr. Quinn did not opine as to the precise cause of the tear, nor did she offer an opinion that the tear was caused by both a finger and penis.

¶58        The prosecutor asked the victim several times what had happened to her before she explained she was "humped" by Defendant.  When the victim described what Defendant did to her, she was unclear what he touched her with, first referring to *her* hand then Defendant's knee, then referring to being touched in "the butt" by the Defendant's "weenie."  When asked if she was touched with anything else, the victim said "no."  However, the prosecutor then asked the victim if the Defendant "touch[ed] [her] with his hand" she responded "[y]eah."  Ultimately, the victim confirmed that Defendant's hand went "inside" her "butt":

> Q:    It went in it?  When he touched you with his hand, touch your butt with his hand, did it go inside outside or something else?
>
> A:    Inside.

The victim's testimony was sufficient to sustain the jury's verdict on Count 2 under the substantial evidence standard. However, it does not constitute overwhelming evidence.

**¶59**  This conclusion is also reinforced in light of the victim's testimony supporting Counts 1 and 3. On several occasions, she was able to describe the details of Defendant's penile penetration of her "butt" and Defendant's contact with her breasts with much greater specificity than the details she gave relating to Count 2. Furthermore, unlike Count 2, the victim repeated the specifics of Defendant's sexual misconduct under Counts 1 and 3 to several other witnesses, each of whom testified at her trial. Finally, the record lacks evidence corroborating the victim's testimony that digital penetration occurred. Unlike Counts 1 and 3, which was corroborated by Dr. Quinn's DNA testimony that Defendant had kissed her breasts, and that Defendant penetrated the victim with his penis, no such corroborating evidence exists for Count 2's allegation of digital penetration.

**¶60**  In sum, given the facts and circumstances of this case, a reasonable jury "could have reached a different result" on Count 2 if the State had not presented and relied on Hodgekiss's opinion regarding the victim's character for truthfulness. *See Henderson*, 210 Ariz. at 569, ¶ 27, 115 P.3d at 609. Accordingly, Defendant has met his burden of showing prejudice resulting from the fundamental error. *James*, 231 Ariz. at 494-95, 297 P.3d at 186-87. I would therefore vacate the conviction and sentence on Count 2 and remand for a new trial.



Ruth A. Willingham · Clerk of the Court
FILED: ama